IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO.: 3:21-CR-38-KAC-DCP |
| | ) | |
| BENJAMIN ALAN CARPENTER | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
DUE TO ENTRAPMENT AS A MATTER OF LAW**

Comes the Defendant, pro se, pursuant to Rule 12 of the Federal Rules of Criminal Procedure and having moved this Court for an Order dismissing the one-count Indictment due to entrapment as a matter of law, humbly submits his memorandum in support.

**Primary Issue Presented**: Whether the government created and solicited the commission of an alleged crime, its creature, from a law-abiding citizen who was not predisposed in order to prosecute.

## Introduction

At all times staying within the "safe harbor" of 18 USCS §2339B, the Defendant, the leader of an independent Islamic translating and publishing house, translated, edited, and published a number of ISIS Arabic releases into English. As a result, the FBI continued its investigation of the Defendant and an undercover operation was initiated to uncover any criminal activity, such as providing material support to ISIS by working under its direction and control. An FBI OCE, portraying as someone with a connection to ISIS's media department, was tasked to forge a relationship with the Defendant. Thereafter, the FBI OCE was added to the Defendant's online messaging group for his translating and publishing house. Over 218,000 messages were recorded dating back to July 2017. No criminal activity was found. The Defendant was acting independently

of ISIS. Nevertheless, the investigation and undercover operation continued, morphing into a scheme to get the Defendant to "cross the line", seeking, at first, to explore the Defendant's willingness to clearly violate § 2339B by asking if he'd be willing to work as a translator for ISIS. When the Defendant declined the offer, preferring to stay independent, the scheme turned more discreet. A year later and after several media related favors done for the Defendant, the FBI OCE solicited the Defendant's help in translating an Arabic ISIS video to English. After initially saying he can't help with videos, the Defendant said he will take a look at the final draft after it's completed. During this time period the FBI OCE continuously solicited the Defendant's help, invoking sympathy and pleas of need, saying such things as he really needs the Defendant's help; that the Defendant is the best he knows; he is afraid of doing a bad job and letting ISIS's media department down without the Defendant's assistance. After a week and a half after the first solicitation, the FBI OCE sent the Defendant a completed English translation of the video with time-stamps, along with an Arabic transcript for the Defendant to look at—basically all the material work. The Defendant then sent a revised version a couple days later to the FBI OCE and was arrested a month and half later accused of attempting to provide "material support" to ISIS.

## Statement of Facts

Born in Knoxville, Tennessee, the Defendant is 32-years-old at the time of writing. He became a Muslim at around the age of 23.

In May 2015, law enforcement officers executed a search warrant at the Defendant's residence in Blacksburg, Virginia. In connection with the search, FBI agents interviewed the Defendant after gaining his consent. The Defendant was questioned pertaining to an investigation stemming out of the Northern District of Illinois involving Hasan Edmonds and Jonas Edmonds, two cousins. Before being asked, the Defendant informed the two FBI agents who conducted the

interview his "Kunya" (moniker) is Abu Hamzah (it's common for Muslims to have a moniker, e.g., the Prophet's, peace be upon him, moniker was Abul-Qasim). The Defendant admitted to knowing and having correspondence with Jonas, using Facebook and Twitter accounts closed for content certain people consider "radical"- although perfectly legal-, and for taking news about ISIS and the war raging in Iraq and Syria from Twitter and posting it on Facebook, but denied any knowledge of a planned attack—let alone any type of involvement. He was accused by the FBI agents of being a "webmaster" and the "mastermind" behind the cousins' proposed plan and for having a connection to overseas ISIS members who release videos. None of that turned out to be true. In fact, in a later meeting with the same FBI agents that occurred at the Defendant's request, Greg Hunt, one of the agents, admitted to the Defendant his "role" was greatly exaggerated; in truth, it was made up. The Defendant's phone, laptop, and various writings were seized and searched for any evidence linking him to the two cousins' plan and to overseas ISIS members. Nothing of the sort was found. What was found, however, were notes pertaining to the meaning of jihad,[1] conversations between the Defendant and his wife surrounding contemporary issues related to Hijrah,[2] and a multitude of ISIS related media – none of which is illegal to possess or discuss. Due to the lack of evidence of any criminal activity, the Defendant was never indicted. The investigation continued, nonetheless.

During the above interview the Defendant was also questioned about his beliefs. The Defendant has no qualms in stating what he believes in, even if it is controversial. Thus, when asked about the September 11, 2001 attack on the United States he stated plainly he believes it was

---

[1] Jihad linguistically means to struggle and strive. But in the legal sense (i.e., how it is employed in Islamic law) it carries the meaning of fighting against disbelievers with oneself, wealth, and/or tongue to raise the word of God.
[2] Hijrah linguistically means migration. But in the legal sense, it means to migrate from the lands of disbelievers to lands ruled by Islamic law.

3

justified, because Islamic law permits such an attack against a nation that attacks the sovereignty of God, supports and maintains the invasion of Muslim lands, and persecutes and kills Muslims. This is simply an objective observation. The Defendant denied he had allegiance to the Islamic State, but when asked if he supported ISIS, he clarified if what is meant by support are the political goals of that small group (i.e., restoring the Islamic Caliphate and ruling by Islamic law), the answer is "yes." If what is meant, however, does he provide direct support, the answer is "no."

The Defendant again met with the two FBI agents shortly afterwards when they came to his Virginia residence to return his phone, laptop, and other items seized. The Defendant commented on the draconian laws present in the United Kingdom and how one can be arrested there for simple possession of "terrorist media." They agreed and stated it's perfectly legal to possess them in the United States, but told the Defendant if he did not stop his online activity (i.e., re-posting publically available videos released by ISIS to Facebook and posting on Facebook news about the war in Iraq and Syria taken from Twitter) the FBI would continue to investigate him and, to quote Greg Hunt, "wait" for him "to cross the line." As will become apparent, the FBI eventually got fed up with waiting and decided to take matters into their own hands to incite the Defendant closer to "the line." The FBI agents also asked the Defendant to call them and let them know his new address, as the Defendant was a couple days away from moving to a different apartment. Because the Defendant is a free man doing nothing illegal, even if the government does not like it, and has a right to privacy, he found the suggestion reprehensible and did not call them. The Defendant lives out in the open without hiding his beliefs and activity. If the FBI wanted to know his new address, they could easily find it.

In June 2016, the Defendant set up a meeting with the same FBI agents after learning he was arbitrarily placed on the "No-Fly List," a "terrorist" watch-list prohibiting air travel over the

4

United States. The Defendant was attempting to acquire a refund for airline tickets to England, where he was planning to travel to visit his wife and requested a letter from the FBI to the airline stating he was not permitted to fly. The agents took it as another opportunity to question the Defendant's beliefs. When asked about his view on the Orlando shooting, he said he understood why it happened: the shooting was in response to American foreign policy, namely its indiscriminate bombing campaign in Iraq and Syria that saw scores of Muslims maimed and killed. When asked if he could personally conduct an attack in like, he said no, and added he wages jihad with a pen instead of a sword, making it a point to clarify his intention was to wage jihad by teaching Islam. He also stated the Quran is clear in defining jihad as fighting with weapons in a wide sense in contrast to the deviant, modern view that it means overcoming one's desires. The agents referenced U.S. civilians and the Walmart parking lot where the interview was happening and whether they were legitimate targets of attack in the ongoing war fought in Iraq and Syria. The Defendant stated, unlike in the past, there are no defined battlefields in today's conflicts, a fact FBI agents and American leaders, both civilian and military, know. Wars today are fought amongst the people. The Defendant repeated innocent Muslims were being killed in Iraq and Syria by bombs from American jets. When asked if U.S. civilians knew they were at war, he replied they ought to know and should not be surprised at attacks targeting them because their nation, in their name, is killing Muslims. This is simply a hard, honest assessment regarding modern realities. Asked if he could every carry out an attack on a civilian, the Defendant, having already answered this question, again stated no.[3]

---

[3] The Defendant also believes China has more of a right to Taiwan than the United States and Russia would be justified in a sense by invading Ukraine. These assessments do not mean he will ever assist China in acquiring Taiwan or Russia invading Ukraine. They are simply his beliefs based on objective assessments.

5

The Defendant then brought up an individual named Tarek Mehanna because his case involved translations, although it was meshed in with a cluster of other activities, some more serious than others, and used mainly as supporting evidence, not evidence of guilt by itself. While discussing his case, Greg Hunt interjected, "I can't do anything about translations." This was the meeting where Greg Hunt told the Defendant his "role" vis-à-vis the Edmonds' cousins was greatly exaggerated. When asked how he could fly and get off the No-Fly List, he was told to fly out of Mexico or become an informant. The Defendant declined their offer. The meeting ended when the Defendant got fed up and annoyed at the continued pestering and walked away.

The Defendant had asked about Mehanna and translations because the Defendant managed a blog hosted by wordpress.com containing a plethora of translated materials from figures like Usama ibn Ladin, Abu Yahya al-Libi, Abu Muhammad al-Adnani, and Abu Bakr al-Baghdadi. The blog contained numerous other scholars not affiliated with any foreign terrorist organization, but the Defendant wanted to see where "the line" was Greg Hunt referenced before. Translation didn't cross that line.

The Defendant eventually shifted away from sharing ISIS releases and news updates on Facebook, focusing instead on spreading Islamic knowledge pertaining to creed and methodology. Around the summer of 2017, he and other amateur ("one who engages in a pursuit, study, science, or sport as a pastime rather than as a profession." Merriam-Webster Dictionary, App. 2021) individuals from across the world formed a small group, with the Defendant as its leader, to further that objective. That group was Ahlut-Tawhid (lit. the people of monotheism) Publications (ATP). ATP, based totally online, dedicated itself to the translation and publication of texts and videos elucidating the authentic creed and methodology from a multitude of authors, both contemporary and not. Included within this taxonomy: pro-ISIS and official ISIS texts and media focused on

6

explaining the authentic creed and methodology (e.g., *Clarifying Matters of Methodology* and *Ten Matters of Aqidah (Creed) Every Muslim Should Know,* both official ISIS releases originally in Arabic outlining the authentic creed and methodology ATP translated into English).

As a part of a strategy to bring awareness, spread the works of scholars, explain the authentic creed and methodology, and promote upcoming ATP releases, the Defendant founded a newsletter in December 2017. It ran nearly weekly until its final issue in December 2019. A number of issues in, a section was added for ISIS related news released the previous week, including ISIS reports of enemy deaths, injuries, and vehicle destructions; combat visuals were also added.[4] Due to the added section and uploading them to his blog, ahlutawhid.wordpress.com, which served as an archive for Islamic translations, was suspended. The newsletter then became the primary vehicle and outlet for spreading the authentic creed and methodology. The Defendant had the file from the blog and enough content to run a weekly newsletter for years to come. Also added in the beginning of the newsletter were translations of editorials from ISIS's own weekly newsletter, al-Naba. Most of the translations of that type were not original; they were edited additions of another's effort. At no point in time did the Defendant work under the direction or control of ISIS in producing any media. It was all from his volition and desire to spread the authentic Islamic creed and methodology, an objective that coincided with ISIS's and Muslims' worldwide. One thing strikingly different between the releases and publications of ATP and that of ISIS is the lack of a call to violence in ATP's releases.

Although none of the foregoing is illegal and is protected by statute, the FBI, continuing their investigation into the Defendant, sent one of their online-covert employees to forge a

---

[4] All of the ISIS related news was taken from Telegram groups and channels. Telegram is a social media application used on mobile and desktop devices. It values privacy and guards against the encroachment of governments pertaining to that right, advertising itself to have never disclosed any user information to third parties, including governments. It is popular with over 55 million active users daily.

relationship with the Defendant and, assumingly, see if there was a direct link between the Defendant and ATP on one hand and ISIS on the other. The Defendant and the online-covert employee (OCE) began interacting around the middle of 2019. By December 2019 the Defendant trusted the OCE enough to add him to ATP's private Telegram group. The OCE portrayed himself as media savvy and as having a connection to ISIS's media department. The OCE would frequently send channel and group links to ISIS channels and groups that would disseminate official news and releases. Within the group the OCE captured around 218,000 messages dating as far back as July 2017. No illegal activity was found. ATP and the Defendant were confirmed to be independent. The investigation, instead of stopping, morphed into a scheme to pull the Defendant closer to "the line" in order to prosecute and silence him.

As mentioned above, the FBI OCE was a member of an ATP group on Telegram. As a member, the FBI OCE and the Defendant interacted on Telegram. Some of the interactions between the two were made within the group, where the FBI OCE mainly sent ISIS news channels and groups that disseminated ISIS content while others were exclusively between the FBI OCE and the Defendant within Telegram's "secret chat" function, the FBI OCE's preferred venue of communicating with the Defendant.[5]

Prior to the conduct described below, the Defendant criticized previous translations published by ISIS's media department to FBI OCE. For example, in September 2019, FBI OCE asked the Defendant if he ever used translations published by ISIS's media department in ATP's newsletter. The Defendant responded, "Use but they are very rough and need editing/May Allah bless whoever is translating them." Again, in October 2019 the Defendant asked FBI OCE, "Do

---

[5] The secret chat feature uses end-to-end encryption, which means only the sender and recipient have the ability to view the content of the chats; they also can be set to self-destruct. Certain governments, such as the Russian, Chinese, and American governments, deplore Telegram and its privacy features due to it not allowing them to view the private conversations of their citizens whenever they desire.

we know who or whom is translating Naba articles and the speeches? . . . They are very poor Akhi (my brother)/We need a major improvement." FBI OCE responded, in sum, that the Defendant's help is needed and if he would be able to work as a translator. The Defendant replied that he cannot work as a translator and preferred to stay independent, to the dismay of the FBI.

On January 27, 2020, ISIS released a speech by its official spokesman, Abu Hamzah al-Qurashi. The speech was only released in Arabic. On the same day, al-Hayat Media Center, a media outlet charged with translating official ISIS releases posted English excerpts. In ATP's group, the Defendant commented on the excerpts saying, "The translations are very poor." The next day the Defendant commented on another post, "Can't look at these translations without getting annoyed/May Allah bless the ikhwah (brothers)/At least they trying." The FBI OCE commented on these statements by asking the Defendant if he thought he could do better. The Defendant replied by stating, "The translations of ATP are much better . . . the translations are poor and have been poor/And that needs to be conveyed to whoever is doing them so they don't think they don't need to improve."

A year later on January 8, 2021, ISIS released an Arabic video from its Sinai Province entitled, "Bleeding Campaigns," documenting its military operations against Egyptian troops. Throughout the time the Defendant knew FBI OCE, the FBI OCE would do favors for the Defendant (e.g., helping him with ATP videos, making Telegram channels, providing news links). And sometime in January 2021, the Defendant asked FBI OCE to make duplicate copies of a particular Telegram channel the Defendant managed and to transfer a large mega.nz file to Telegram. In the midst of these favors, on January 30, 2021, the FBI OCE initiated a chat with the Defendant stating he was very excited because the "diwan" spoke of a project to relaunch al-Hayat Media Center. Confusion arose between the two because al-Hayat Media Center was still releasing

content. The FBI OCE informed the Defendant the diwan wanted to translate recent videos and release them through Nashir (lit. Publisher), a name of an Arabic Telegram channel that publishes ISIS releases. The Defendant replied, "Alhamdulillah (all praise belongs to God) that's good." The FBI OCE stated only trusted brothers are wanted to work on the project. After asking how many translators are there and being told there was only one, the FBI OCE stated, "I don't want to ask you because you're busy and do such good work, but would you be willing to help with translation?"[6] "With videos I can't," the Defendant replied. "No?" the FBI OCE further inquired. "Guess it depends," the Defendant said. FBI OCE further said, "It's just you are the best with translations I know, and I don't want to disappoint the diwan."

In 2020 ISIS released a series of video entitled, "To Be Absolved Before Your Lord." The series was published in parts. Part 1 was released from the Yemeni branch (which distinguished ISIS from AQAP and rebuked AQAP; Part 2 from the Khurasani branch (which distinguished ISIS from the Taliban and rebuked the Taliban); and Part 3 from the Somalian branch (which distinguished ISIS from Shabaab and rebuked Shabaab). During the conversation between the Defendant and FBI OCE, the Defendant stated the Taliban video should be at the top of the list to be translated, as well as the Yemen video because it exposed AQAP. The Defendant would later say, going through the Sinai video, he doesn't see any need to translate it over the above two. FBI OCE asked if the reason he didn't want to help was due to the disbelievers around him; the Defendant replied "No[,] just prefer to edit and it's easier when there is a transcript." Then commented, "The Mushrikin (polytheists) use their spies and agents to trap ikwan (brothers Allahul-musta'an (God's help is sought)." "May Allah curse them all," the FBI OCE said. "Amin."

---

[6] The quotations from the FBI OCE have been rendered into better understandable English throughout.

On February 1, the FBI OCE again initiated a chat and stated the "bro" was halfway done with the translation and asked the Defendant if he could help with editing the translation, since he was hesitant and hadn't committed. The Defendant replied, "I'll take a look at it akhi (my brother) but I can't promise anything." Invoking sympathy with pleas of need, the FBI OCE stated, "Bro, any help you can give with editing I really appreciate because I don't want to disappoint the diwan with a bad translation and I know the bro is having a hard time with some parts." "Ok," the Defendant replied.

On February 2, 2021, the FBI again initiated a chat with the Defendant stating the "bro" sent what he had done so far and made an Arabic transcript as well and asked the Defendant if he wants him to send it. The Defendant told him to send the partially completed English translation and Arabic transcript to his other Telegram account. After skimming through the English, the Defendant remarked, "Bro this is very good . . . There wouldn't need much editing when he is finished by the looks of it."

On February 5, 2021, the FBI OCE again initiated a chat stating the translation is mostly done and asking if he should send it. The Defendant ignored the messages. The FBI OCE, again invoking sympathy, with pleas of need, stated, "I will be honest with you akhi al habib (my beloved brother), I've had to ask so much because we need your help; and I am worried. I don't want to do a bad job for the diwan, and without you I am worried."

On February 7, 2021, the FBI OCE again initiated a chat with the Defendant saying the "bro" finished and sent the completed translation and Arabic transcript. These versions had time-stamps added to match the times in the video. The Defendant replied, "It looks good . . . Will get back to you in sha Allah (God willing)."

On February 10, 2021, the FBI OCE again initiated a chat and asked how things were going. The Defendant, not having the time or want to check the translation, sent it to someone else. The FBI OCE expressed dismissal as only the Defendant was sought.

On February 11, 2021, the Defendant told the FBI OCE, "The akh (brother) said there are many mistakes and many parts left out, so he's had to redo it."

On February 13, 2021, the Defendant wrote, "The akh finished Alhamdulillah/Just needs a little editing."

On February 14, 2021, the Defendant sent the FBI OCE a Microsoft word file containing the revised English translation of ISIS's "Bleeding Campaigns" video.

Thereafter the FBI OCE continued to solicit the Defendant's help vis-à-vis another video pertaining to the Taliban mentioned earlier. The Defendant referred him to someone else if he wanted any more help.

On March 23, 2021, the Defendant was arrested, while helping an older woman on oxygen due to COVID-19 complications, accused of providing "material support" to ISIS.

**Argument**

As a matter of law, the Defendant was entrapped by the FBI because (1) he was not predisposed to attempt to provide material support to ISIS; (2) the FBI took advantage of the legal activity of the Defendant; (3) the alleged crime stems from the creative activity of the FBI; (4) the FBI OCE solicited its commission; and (5) left to his own devices, the Defendant would never have committed the alleged crime.[7]

---

[7] The Defendant maintains the alleged activity does not amount to "material support" and thus not a crime. So, although entrapment is an affirmative defense, a defendant is permitted to deny one or more elements of the offense. *See, Mathews v. United States*, 485 U.S. 58 (1988).

While entrapment cases usually surround issues of fact, and thus for the jury to decide, a court may order a dismissal before trial "where the testimony and facts are undisputed; and the evidence demonstrates a patently clear absence of predisposition." *United States v. Clark*, 957 F.2d 248, 250-51 (6th Cir. 1992). Both conditions exist in the instant case: the facts of what transpired have mostly all been recorded, seeing as they revolve around online-messaging chats; and there is a clear absence of predisposition on the part of the Defendant to violate the law.

Deception and undercover operatives are legitimate law enforcement techniques for the detection and prosecution of criminals. ("Artifice and stratagem may be employed to catch *those engaged in criminal enterprises.*" *Sorrells v. United States*, 287 U.S, 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (citations omitted)) (Emphasis added). The rightful purpose of this permitted activity is to reveal "would-be violators of the law." *Ibid*. "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540 (1992) (citations omitted). Thus, "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States*, 356 U.S. 369, 2 L.Ed.2d 848, 78 S.Ct. 819 (1958). Herein, a trap was set up against an unwary innocent – the Defendant – who would not have committed the alleged offense minus the FBI's involvement and inducement. *See Sorrells* (1932) (stating if the defendant would not have committed the crime but for the government's inducement, an entrapment defense should prevail); *see also Sherman* (1958) (declaring entrapment is established as a matter of law when the government agent originated the criminal design, planted it in the mind of an innocent defendant, and as a result of the urging of the government agent, the defendant subsequently committed the crime).

13

To determine precisely which defendant is which – an unwary innocent or unwary criminal – courts, following the guidance of the Supreme Court, look towards the predisposition of the Defendant. This, after it's been proven the government induced the Defendant to commit the act. *United States v. Khalil*, 279 F.3d 358 (6th Cir. 2002).

There should be no dispute the government induced the Defendant to commit the alleged offense. ("Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *USA v. Poehlman*, 217 F.3d 692, 2000 WL 821290 (9th Cir. 1999)). ("[Inducement] includes soliciting, proposing, initiating, broaching, or suggesting the commission of the offense charged." *Sherman* 1958 (Hand, J. concurring)). The FBI did not appear one day and present to the Defendant an opportunity to provide material support to ISIS, one he would have declined. He was, instead, subject to a years long investigation and undercover operation – without any criminal enterprise or activity being discovered; what was discovered was expressive speech and activity, protected not only by the U.S. Constitution but by virtue of the very statute the Defendant is being prosecuted under today[8] – expressive speech and activity the government does not like it should be noted. As the Defendant's mother said in an interview with a reporter from Hard Knox Wire, "They've had nothing to arrest him on, thus the undercover agent meant to get him to 'cross a line.'"[9] With inducement proven as a matter of fact, courts look to the second element of a valid

---

[8] Section (h) of 2339B states, in part: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." And section (i) states: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States."

[9] "Free Speech or Terrorism." Hard Knox Wire, April 12, 2021. Note: The article contains misinformation such as claiming the Defendant possesses an Arabic – language website where he posted articles such as

14

entrapment defense: a lack of predisposition on the part of the defendant to commit the offense charged. And "[w]hen the uncontradicted evidence shows a lack of predisposition, entrapment can be determined as a matter of law." *United States v. Moore*, 916 F.2d 131 (6th Cir. 1990) (citations omitted).

There is zero evidence the Defendant was predisposed to provide material support to ISIS and that he would have "crossed the line" minus the government's creative activity. ("The controlling question [is] whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." *Sorrells* (1982)).

The Sixth Circuit has traditionally identified a number of factors relevant to the issue of whether a defendant was predisposed to commit the offense at issue:

1. The character or reputation of the defendant, including any prior criminal record;
2. Whether the suggestion of the criminal activity was initially made by the government;
3. Whether the defendant was engaged in criminal conduct for profit;
4. Whether the defendant evidenced reluctance to commit the offense charged, overcome by repeated government inducements or persuasion;
5. The nature of the inducement or persuasion supplied by the government.

*See Moore* (1990).

Regarding the first set of factors – character or reputation – the evidence shows a lack of predisposition to provide material support to ISIS. What it does show, however, is "a generic inclination to act within a broad range," here being to translate ISIS material or even "vigorously promoting and supporting the political goals of the group" (*Humanitarian Law v. Reno*, 205 F.3d

---

"The Ruling on Beheadings," and others mentioned therein. The Defendant maintained an English-language website (peopleoftawhid.org) where all those articles mentioned are not found.

15

1130 (9th Cir. 2000)), none of which is criminal, and "is of little probative value in establishing predisposition." *Jacobson*, 503 U.S. 540 (1992). It is one thing to translate ISIS releases and another to provide material support to ISIS. At all times the Defendant acted within the law when translating ISIS releases within and without his translating and publishing house. Evidence of predisposition to do what is legal is not evidence of predisposition to do what is unlawful. ("Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal . . ." (*Ibid*). Furthermore, evidence indicating the Defendant's beliefs, including "a willingness to promote a given agenda [, . . .] hardly support an inference that he would commit the crime of" (*Ibid)* providing material support. Indeed, the Defendant's beliefs are protected by the United Stated Constitution and are out of the reach of government. *See Ibid*; ("The makers of the Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, and his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. *They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against government, the right to be let alone* – the most comprehensive of rights and the right most valued by civilized man." *Olmstead v. United States*, 277 U.S. 438 (1928) (Brandeis, J., dissenting) (emphasis added).

It's obvious, as well, regarding the second factor, that the suggestion of the alleged crime was initially made by the government. The same is true for the third factor: it's clear the Defendant was not engaged in criminal conduct at all – for profit or otherwise. The Defendant also evidenced reluctance and was subjected to numerous pleas of need and sympathy (the fourth factor). And the nature of such inducement included all the tools to commit the act (i.e., the government supplied a translation of the Arabic with time-stamps, plus an Arabic transcript of the video, for the

Defendant to look at and edit). Minus the government's creative activity and inducement, the Defendant would not have thought about committing the alleged crime, and thus was entrapped as a matter of law. ("When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would never have run afoul of the law, the courts should intervene." *Jacobson*, 503 U.S. 540 (1992).

Furthermore, Congress could not have intended to provide a "safe harbor" within the confounds of 2339B in order for the executive branch to take advantage and set a trap for a law-abiding citizen. ("Like the *Sorrells* Court, we are 'unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detention and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.'" *Jacobson quoting Sorrells*, at 448) ("The first duties of the officers of law are to prevent, not to punish. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. Here, the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." *Sorrells*, *quoting Butts v. United States*, (C.C.A. 8th) 273 F.35, 38, 18 A.L.R. 143.

In addition to what preceded, the government contravened the Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations, which state, under section "V. Protecting Innocent Parties Against Entrapment":

> No undercover activity involving an inducement to an individual to engage in crime shall be authorized unless the approving official is satisfied that –

     (1) The illegal nature of the activity is reasonably clear to potential subjects; and

     (2) The nature of any inducement offered is justifiable in view of the character of the illegal transaction in which the individual is invited to engage; and

     (3) There is a reasonable expectation that offering the inducement will reveal illegal activity; and

     (4) One of the two following limitations is met:

          (i) There is reasonable indication that the subject is engaging, has engaged, or is likely to engage in the illegal activity proposed or in similar illegal conduct; or

          (ii) The opportunity for illegal activity has been structured so that there is reason to believe that any persons drawn to the opportunity, or brought to it, are predisposed to engage in the contemplated illegal conduct.

*See* The Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations, 2002. The failure to uphold just one of the four guidelines renders the undercover activity improper as evident by the usage of "and" in between each guideline. The "illegal nature of the activity" was not "reasonably clear," further explained in the Defendant's motion to dismiss based on vagueness, failing the first test as a result; the continuous pleas based on need and sympathy exceeded justifiable limits; third, the FBI knew there was no illegal activity to reveal; and regarding the two limitations under guideline four, the FBI knew the Defendant was not engaging in illegal activity and was not predisposed to provide material support to ISIS, as opposed to being predisposed to independent activity.[10]

      Wherefore, the Defendant is asking this Honorable Court to intervene and dismiss the Indictment with prejudice.

---

[10] Furthermore, the government ran afoul with The Attorney General's Guidelines for Domestic FBI Operations (2008), which state: "These Guidelines do not authorize investigating or collecting or maintaining information on United States persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States (*Ibid,* p.13)."

18

Respectfully submitted this 22 day of February 2022.

/s/ Benjamin A. Carpenter
BENJAMIN A. CARPENTER