UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BENJAMIN ALAN CARPENTER<br>a/k/a "Abu Hamza" | Case No. 3:21-CR-38<br><br>Judges Crytzer / Poplin |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS TO DISMISS THE
INDICTMENT FOR VAGUENESS, OVERBREADTH, AND ENTRAPMENT**

The United States of America, by Francis M. Hamilton III, United States Attorney for the

Eastern District of Tennessee, respectfully submits this response in opposition to the Defendant's

Motion to Dismiss the One-Count Indictment Founded on the Void-for-Vagueness and

Overbreadth Doctrines (Docs. 58, 59), and the Defendant's Motion to Dismiss Due to

Entrapment as a Matter of Law (Doc. 64).

The Defendant's Vagueness and Overbreadth challenges should be denied in light of the

Supreme Court's decision in *Humanitarian Law Project v. Holder*, 561 U.S. 1 (2010). In

*Humanitarian Law Project*, the plaintiffs who included individuals and organizations seeking to

support the lawful, nonviolent activities of a foreign terrorist organization, challenged 18 U.S.C.

§ 2339B ("material support statute") on, among other things, vagueness and First Amendment

grounds. The Supreme Court upheld the material support statute holding, in relevant part, that

the term "service" is not vague because "a person of ordinary intelligence would understand the

term 'service' to cover advocacy performed in coordination with, or at the direction of, a foreign

terrorist organization." *Id*. at 24. Similarly, the Supreme Court held that the material support

statute does not violate the First Amendment because it "is carefully drawn to cover only a

narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*. at 26.

In this case, the Defendant is charged with attempting to provide material support in the form of translation services to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization ("FTO"). The Defendant, believing the translation was requested by ISIS and would be published by ISIS, provided the translation to an individual he believed was working for ISIS. Such concerted activity falls comfortably within the confines of *Humanitarian Law Project*. As such, the Defendant's vagueness and overbreadth challenges should be denied. And because the Defendant's "as-applied" vagueness challenge is premature, this argument should be denied without prejudice to renew at trial.

Likewise, the Defendant's Motion to Dismiss Due to Entrapment as a Matter of Law should be denied. Because the undisputed evidence does not demonstrate a "patently clear absence of predisposition," the entrapment issue should be left for the jury. *United States v. Schaffer*, 586 F.3d 414, 426 (6th Cir. 2009).

## ARGUMENT

## I.     The Material Support Statute Is Not Void for Vagueness As Applied to the Defendant

A criminal law that is unconstitutionally vague violates a person's Fifth Amendment right to due process of law. *Johnson v. United States*, 576 U.S. 591 (2015). A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Humanitarian Law Project*, 561 U.S. at 18 (internal quotations omitted).

Courts analyze vagueness challenges as applied to the particular facts of the case before it. "We consider whether a statute is vague as applied to the particular facts at issue, for '[a]

2

plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 18-19 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). "A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Hoffman Estates*, 45 U.S. at 495.

The Defendant has been charged with one count of attempting to provide material support, in the form of services, to ISIS in violation of Title 18, United States Code, § 2339B. More specifically, as alleged in the indictment:

> From on or about January 30, 2021 to on or about February 14, 2021, in the Eastern District of Tennessee and elsewhere, BENJAMIN ALAN CARPENTER, a/k/a "Abu Hamza" defendant herein, knowingly attempted to provide "material support and resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, the Islamic State of Iraq and al-Sham (ISIS)…, including, among other things, services….

(Doc. 3, ¶1.)

The Defendant argues that the term "services" "is unconstitutionally and impermissibly vague as applied to the Defendant…." (Doc. 59 at 14.) The crux of the Defendant's argument is that "service" is unconstitutionally vague as applied to him because it is not defined in the statute while some sub-categories of "material support or resources," such as "personnel" and "expert advice and assistance," are defined.

The term "service" is not specifically defined in the statute nor, contrary to the Defendant's position, does it need to be. The ordinary meaning of the word suffices. Courts have historically struck down words that were ambiguous. *Humanitarian Law Project*, 561 U.S. at 20-21 ("We have in the past 'struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly subjective terms without statutory definitions, narrowing context, or settled legal meanings"); *United States v. Hart*, 635 F.3d 850,

858 (6th Cir. 2011) (holding term was not constitutionally vague when it has an ordinary meaning that is not subject to ambiguity).

"Service," however, as set forth in the material support statute, is not ambiguous and "does not require similarly untethered, subjective judgments." *Humanitarian Law Project*, 561 U.S. at 21. "[A] person of ordinary intelligence would understand the term 'service' to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." *Id*. at 24.  In other words, to violate § 2339B by providing a "service," the government must prove that the Defendant engaged in concerted activity, not independent activity, that was done in coordination with, or at the direction of, an FTO, or at least an attempt to do so. *Id*. at 23-24. As the Defendant's conduct constituted such concerted activity, the term "service" is not vague as applied to the Defendant.

Notwithstanding the factual infirmities of the Defendant's vagueness challenge, as detailed below, his claim is not yet ripe for adjudication.  In *United States v. Thompson*, the defendant argued that the indictment against him must be dismissed on vagueness grounds, as the criminal offenses were not defined with sufficient definiteness to give notice of criminal conduct. 207 F. Supp. 3d 106, 112 (D. Mass. Sept. 13, 2016).  The court found that this challenge was premature, as the question of whether the criminal offenses are vague as applied to the defendants' conduct needs to be decided in context of the evidence presented at trial. *Id*.; *see e.g.*, *U.S. v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997) ("We conclude that such a sensitive and fact intensive analysis as that undertaken by the district court should be based only on the facts as they emerge at trial."); *U.S. v. United Memorial Hosp.*, 2002 WL 33001119 at *4 (W.D. Mich. July 23, 2002) (concluding that "pre-trial challenge to the vagueness of the federal statutes at issue is premature and should be raised, if at all, under Federal Rule of Criminal Procedure 29.");

4

*People's Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 530 (6th Cir. 1998) (stating that in a previous case void-for-vagueness challenges were not fit for judicial resolution prior to final agency action).

Accordingly, the Defendant's "as applied" vagueness challenge should be denied without prejudice to renew after the government has presented its case at trial.

Even if the Defendant's vagueness challenge was not premature, it fails for several additional reasons. First, the Defendant was fully aware that ISIS was a designated FTO and that providing material support to ISIS was illegal, which reduces any potential for vagueness. *Humanitarian Law Project*, 561 U.S. at 21. Second, the Defendant believed he was providing an English translation at ISIS's direction. Third, the Defendant was expressly aware of the importance that ISIS placed on the provision of media support in order to advance its organizational goals.

A. The Defendant was aware that ISIS was a designated FTO and that providing material support to ISIS was illegal.

Section 2339B requires that, as an element of the offense, the government prove that the Defendant "have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity …, or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). The "knowledge requirement of the statute further reduces any potential for vagueness." *Humanitarian Law Project*, 561 U.S. at 21.

From at least 2015, the Defendant was expressly aware that ISIS was a designated FTO and that providing support to ISIS was illegal. In multiple recorded interviews with the Defendant, including two before the conduct alleged in the indictment, FBI agents told the Defendant that ISIS was a designated FTO and the Defendant confirmed his understanding. One such interview occurred on October 28, 2015. When the interviewing agents told the

5

Defendant that ISIS was a designated FTO, the Defendant stated that it was his understanding that the designation had actually started in 2014.

In addition to knowing about the designation, the Defendant was also aware that ISIS was engaged in terrorist activity and terrorism. During the course of the investigation, the government obtained a large volume of ISIS media in the Defendant's possession that demonstrates his knowledge that ISIS was involved in terrorist activity and terrorism. Specifically, and by way of example, the Defendant possessed a video published by Al-Hayat, an official ISIS media organization, titled, "For the Sake of Allah." The video contains footage of ISIS fighters in battle and includes an English-language voiceover providing a call to arms against the "kuffar."

Not only was the Defendant aware that ISIS was a designated FTO and engaged in terrorist activity, and terrorism, but he also knew that providing material support to ISIS was illegal. In his recorded, post-arrest interview, the Defendant told FBI agents that if ISIS told him to publish *From Dabiq to Rome*, a newsletter created by the Defendant's pro-ISIS media organization Ahlut-Tawhid Publications ("ATP") which contained English translations of pro-ISIS and official ISIS media, the publication of the newsletter would constitute "material support."

> DEFENDANT: "I know what you're getting at. You're saying this – this – that's the material support that – but that's just not the – there's no – there's no link. The link is only a general Muslim-Muslim link. There's no like organ- or organizational link or directive link, you know what I mean? Like from a head central authority, disseminate *From Dabiq to Rome*, do this or that. No. It was from my initiative.
>
> AGENT SMITH: "Okay. But it would be material support if ISIS had said ---
>
> DEFENDANT: "That's my understanding."
>
> AGENT SMITH: "--- publish ATP."

6

DEFENDANT: "That's my understanding. Yeah. Then that's why I did what I did because I – talking to the other FBI agents, too, they said the translations, they really can't do anything. So, yeah, that's my understanding there."

AGENT SMITH: "Okay. So if ISIS had told you push out *From Dabiq to Rome*"

DEFENDANT: "Right. That would have been material support."

AGENT SMITH: "That would have been material support."

DEFENDANT: "Definitely."

The Defendant argues that the material support statute is unconstitutionally vague regarding "the amount of coordination alleged between the Defendant and ISIS." (Doc. 59 at 10.) In support of this argument, the Defendant offers that "he reasoned by reading FBI reports of other individuals accused of providing material support to ISIS and by talking to FBI agents in person that he could translate and edit what he wanted" but that only "working within ISIS's media department would likely subject him to prosecution."[1] (*Id.*) This argument is contradicted by the Defendant's own statements excerpted above. His statements during the post-arrest interview make clear that the Defendant is aware that if ISIS directed him to publish a newsletter, such conduct would be illegal even without him working within ISIS's media department.

This exchange makes clear that the Defendant was fully aware that providing material support to ISIS was illegal. Furthermore, it demonstrates that the Defendant was aware, at least in a general sense, that the material support statute prohibited activity performed "in coordination with, or at the direction of" an FTO but not activity performed "entirely independently" of the FTO. *Humanitarian Law Project*, 561 U.S. at 23-24.

---

[1] In the Defendant's motion, he asserts that FBI Special Agent Greg Hunt "told the Defendant when asked about translations, 'I can't do anything about translations.'" (Doc. 59 at 10, n.6.) The government has been unable to locate any support for this assertion in its holdings and the Defendant has not provided the government with any discovery.

The Defendant's knowledge of ISIS's designation, his knowledge of the terrorist activity conducted by ISIS, his knowledge of the material support statute to include the distinction in its application between concerted and independent activity, demonstrates that the material support statute is not void for vagueness as applied to him.

B.    The Defendant attempted to perform a service for ISIS.

The Defendant was the leader and administrator of ATP, which was an international, internet-based pro-ISIS media organization known throughout the world. (Redacted Search Warrant Affidavit, Detention Hearing Exhibit 2 at ¶9.)  As the leader of ATP, the Defendant created, translated, and disseminated pro-ISIS and official ISIS propaganda in English. (*Id*.)  In that leadership role, the Defendant demonstrated his commitment to ISIS's violent ideology by working with other ATP members to engage in "jihad with a pen," consistent with ISIS's instructions.

During the time period of the charged conduct, ATP members communicated regularly via Telegram, an encrypted messaging application. (*Id.* at ¶¶ 34, 37.)  Unbeknownst to the Defendant, one of the members of one of ATP's groups on Telegram was an FBI Online Covert Employee ("OCE"). (*Id*. at ¶37.)  The FBI OCE represented to the Defendant multiple times that the OCE was a member of the "diwan," which refers to ISIS's centralized organization that produces and initially disseminates official ISIS media content. (*Id*. at ¶53.)

Beginning at the end of January 2021, the OCE informed the Defendant that the diwan was planning to reinvigorate an inactive official ISIS media organization. (*Id*. at ¶66.)  The OCE further advised the Defendant that, as part of this project, the diwan wanted to translate multiple ISIS videos into English, starting with a video released in early January 2021 by ISIS in the Sinai Province titled, "Bleeding Campaigns." (*Id*.)  This 25-minute video documented ISIS's military

operations against Egyptian troops and depicted ISIS fighters engaging in battle, detonating improvised explosive devices, firing mortars, and executing a suicide bombing. The video also shows the capture and subsequent executions of three individuals, including one alleged to be an Israeli spy. (*Id*. at ¶65.)

The Defendant agreed to help with the translations and utilized the assistance of a fellow ATP member to assist in translating a transcript of the video. (*Id*. at ¶¶ 71-76.) On or about February 14, 2021, the Defendant provided a complete English language transcript of the video to the OCE believing it would be used by ISIS. (*Id*. at ¶77.) After providing the edited translation, the FBI OCE had some initial difficulties in sharing a final product with the Defendant. The Defendant responded, "I'll just wait for the official release in shaAllah." The fact that the Defendant referred to an "official release" further underscores that he believed the FBI OCE worked for ISIS and that ISIS intended the translation to be published through an official ISIS media organization.

The Defendant attempts to downplay the nature of his conduct in order to support his vagueness argument. In doing so, the Defendant describes his conduct as (1) "editing a translation for and at the request of an individual with an alleged connection with a designated terrorist organization" (Doc. 59 at 6, 11), and (2) "taking a look at" an "already completed translation" (*Id*. at 11). The Defendant then goes on to argue that "the amount of coordination between the Defendant and ISIS is impermissibly vague." (*Id*. at 10.)

The Defendant's descriptions fall short. The Defendant did not simply "take a look" at a completed translation provided by the FBI OCE. Instead, the Defendant and at least one other ATP member, over the course of approximately two weeks, provided a significant amount of translation work to complete the English-language transcript of the "Bleeding Campaigns" video.

9

Moreover, the FBI OCE repeatedly told the Defendant that this translation was part of a project that was very important to ISIS, that ISIS wanted the project to remain a secret, and that the project would generate a lot attention.

The Defendant is not charged with providing a service to an individual who has an alleged connection to ISIS, he is charged with attempting to provide a service to ISIS. As the facts above make clear, the Defendant believed that the translation he provided to the FBI OCE was requested by ISIS and would be published by ISIS.

To the extent the Defendant is arguing that the material support statute is vague as applied to him because there was no actual connection between the FBI OCE and ISIS, the Defendant's argument is without merit. The Defendant has been charged with attempting to provide material support and resources to a foreign terrorist organization. By charging attempt, the government is not required to allege or establish actual coordination or direction with ISIS, as long as the government presents evidence that the Defendant attempted to do so.

The Defendant also argues that the material support statute is impermissibly vague to the extent the government seeks to apply it to the Defendant's conduct because the material support statute's prohibition on providing "personnel" to an FTO requires an employer-employee relationship between the Defendant and the foreign terrorist organization. (Doc. 59 at 6-9.) The Defendant's vagueness challenge on this score is inapposite. The Defendant is charged with attempting to provide material support and resources, namely services to ISIS, not personnel. Even if he were charged under "personnel," the government does not have to allege or prove any formal employment relationship.

In making this "personnel" argument, the Defendant cites *United States v. Taleb-Jedi*, 566 F. Supp.2d 157 (E.D.N.Y. July 23, 2008) for the erroneous proposition that "simply editing a

10

translation outside the context of providing 'personnel' cannot survive a vagueness challenge." (Doc. 59 at 7.)  In *Taleb-Jedi*, the government charged the defendant with providing material support to an FTO in the form of personnel. 566 F. Supp. 2d at 165.  The government alleged that the defendant worked for the FTO and taught English classes and translated documents among other things. *Id*. at 182.  The court held that the material support statue was not unconstitutionally vague as applied to the defendant's involvement in making decisions for the FTO but reserved deciding whether teaching English or translating documents was unconstitutionally vague "because it is not clear for what purpose or in what scope defendant translated documents or taught English." *Id*. at 184.

Here, the purpose and scope of the Defendant's alleged conduct is clear: he provided the translation believing it was for ISIS and would be used by ISIS.  In any event, two years after *Taleb-Jedi*, the Supreme Court decided *Humanitarian Law Project* rejecting a vagueness challenge, in relevant part, because the terms "personnel" and "service" include activity "performed in coordination with, or at the direction of, a foreign terrorist organization." 561 U.S. at 24.

Similar to the Defendant's "personnel" argument, the Defendant attempts to recast the allegation in the indictment as violating the material support statute's prohibition on providing "expert advice and assistance" to an FTO.  The Defendant offers that while he "is able to read and understand some Arabic texts regarding Islamic knowledge, … he is not fluent in Arabic, nor has he studied Arabic in a university, [and] it is very unlikely the Defendant would qualify as an 'expert witness' under … Federal Rules of Evidence 702." (Doc. 59 at 12.)  While the Defendant may not have studied Arabic at a university, his description downplays his experience and expertise translating pro-ISIS and official ISIS material.

11

The Defendant has studied Arabic for years and devoted himself to the mission of translating official ISIS and pro-ISIS materials from Arabic to English. One example of the extent of translation that the Defendant was capable of producing, albeit with assistance from other ATP members, is ISIS's publication of "Clarifying Matters of Methodology." ISIS published this extensive work to unify its forces by clarifying theological issues that were creating disunity within ISIS. It is over one hundred pages, complex, and, as far as the government is aware, unavailable in English except through the Defendant's translation. In his post-arrest interview, the Defendant stated the following:

> AGENT SMITH: "So who – who translated, uh, Clarifying Matters of Methodology?"
>
> DEFENDANT: "It was a group of people. I can't remember exactly who but a lot of – various brothers wanted to help in translating that."
>
> AGENT SMITH: "It's a long video. It's not a small undertaking to do that."
>
> DEFENDANT: "Right, right, right, right."
>
> AGENT SMITH: "Who – who was really instrumental in doing that?"
>
> DEFENDANT: "Well, I was at the head of it as editing and putting it together and all that. And the brothers helped me here and there."

In addition, the Defendant claimed to be better at translating than the translators working for ISIS and offered advice on good translation practices. For example, in January 2020, ISIS released English excerpts of a speech given in Arabic by an official spokesperson for ISIS. The Defendant posted a message that "The translations are very poor." When the FBI OCE asked if he thought he could do better, the Defendant stated, "The translations of ATP are much better… the translations [of ISIS] are poor and have been poor / And that needs to be conveyed to whoever is doing them so they don't think they don't need to improve." The Defendant then offered advice on how translations should be done, "The translations, any, need to go through a

12

process. You don't have just one translator and then publish. You have a team of translators and editors. The translations of speeches, etc, are what I would call rough drafts. They require checking and a lot of editing most times."

In any event, the Defendant's suggestion that only experts who would qualify under FRE 702 would be able to provide "expert advice and assistance" under § 2339B misses the mark. The term "expert advice and assistance" is defined to include simply "advice or assistance derived from scientific, technical *or other specialized knowledge*." 18 U.S.C. § 2339A(b)(3) (emphasis added). While the Defendant's attempted provision of material support to ISIS may qualify as "expert advice and assistance," the Court need not address this argument since the Defendant is charged with attempting to provide "services," not "expert advice and assistance."

In support of his vagueness challenge, the Defendant also argues that the similarity between his work for ATP (translating and publishing pro-ISIS and official ISIS media) which he describes as "legal activity" on the one hand, and his alleged criminal conduct on the other (translating an official ISIS video), renders the material support statute vague as applied to him. The government disagrees with the Defendant's conclusion that his work for ATP constitutes "legal activity." While the Defendant has not been charged with this conduct, it does not necessarily follow that such conduct is entirely independent of ISIS especially where, as here and as described in further detail below, ISIS has advertised its need for its supporters to publish and disseminate ISIS media online, the Defendant was aware that ISIS advertised this need, and thereafter the Defendant performed the precise service requested by ISIS.

C. <u>The Defendant was aware of the importance of media to ISIS.</u>

The Defendant knew that ISIS emphasized the valuable and important role played by online media supporters in support of ISIS's mission. As early as 2016, the Defendant told FBI

13

agents that he "waged jihad with a pen not a sword."  The Defendant also told agents that he was responsible for all content released by ATP, including every issue of ATP's newsletter *From Dabiq to Rome*.  *From Dabiq to Rome* issue #35, contains relevant articles reviewing the recent release of an official ISIS media product, "Inside the Khilafah 8."

"Inside the Khilafah 8," encourages ISIS supporters to travel to ISIS to "fight on the front lines."  If supporters were unable to travel, then the video instructed them to "terrorize the disbelievers with your jihad outside the Khilafah by targeting them and shedding their blood."  If this wasn't possible, the video instructed followers to "support your Khilafah on the digital front."  The video then discusses how ISIS started using America's media tools against America in its war on ISIS.  "The Islamic State has utilized the same tools to confront their lies, expose their weaknesses, and destroy their falsehoods.  And to simultaneously incite the believers and call mankind to the straight paths of Allah."

The video listed qualities associated with good ISIS supporters and qualities associated with enemies of ISIS.  One of these listed, "The Supporters of the Khilafah State" included: "The munasir [supporter] amplifies the dawah [call to Islam] of the khilafah [ISIS]; having adopted the messaging put out by its official media; And strives to disseminate it far and wide."  The video encourages supporters to strive patiently in the digital arena, "If they close one account, open another three.  If they close three, open another thirty."  "For with every press of a key on a keyboard, you amplify the force and reach of the explosions.  And with every click of a mouse and every piece of content you disseminate, whether a thunderous nashid or a scene depicting the Khilafah's warriors, your support enrages the disbelievers…."

14

The Defendant's newsletter[2] then specifically discussed "Inside the Khilafah 8." The discussion showed that the Defendant knew that ISIS called for media supporters around the world to provide important and valuable support to ISIS in the online realm. The Defendant's article stated, in part:

> It was a video aimed and directed at the munasirin [supporters] worldwide, as well as making mention of the important role media activities play in this war; and that every muwahhid has a role to play in this war against Islam and its people. Such is not so uncommon, and it is not the first time that a video has been released [by ISIS's central media authority] speaking to the munasirin [supporters] and the knights on the digital front. The munasirin [supporters] play a key and pivotal role in giving support (hence the name) in the trenches of the media war by spreading the content released by the Khilafah, the voice of truth, to reach millions; simultaneously inciting the muwahhidin [correct believers in Tawhid], establishing proof against the people, and calling towards the tawhid [oneness; monotheism] of Allah.

Again, the Defendant attempts to downplay the significance of his conduct by arguing that the charged conduct falls outside what Congress intended when it passed the material support statute and falls outside the heartland of other material support prosecutions. (Doc. 59 at 14-18.) The Defendant is incorrect on both points. First, as *Humanitarian Law Project* makes clear, Congress intended to prohibit any form of material support to FTOs. 561 U.S. at 30 ("Congress's use of the term "contribution" is best read to reflect a determination that *any form of material support* [except for medicine and religious materials] furnished 'to' a foreign terrorist organization should be barred, which is precisely what the material-support statute does." (emphasis added)). And second, use of the material support statute in connection with the Defendant's alleged conduct is consistent with other material support prosecutions. *See, e.g.*,

---

[2] Before discussing "Inside the Khilafah 8," *From Dabiq to Rome* #35 contained articles titled, "A Message to the Munasirin [supporters]," which included a warning, "Beware, O lions of information and warriors of media, of taking news from any source other that the Central Media of the Islamic State," and an article, "The Media War Against the Islamic State," which discussed the how the age of information allowed a media "crusade" against the Islamic State.

15

*United States v. Mehanna*, 735 F.3d 32, 47-51 (1st Cir. 2013) (affirming guilty verdict on material support charges based in part on translation activity); *United States v. Mustafa*, 406 F. App'x 526, 530 (2d Cir. 2011) (affirming denial of void-for-vagueness challenge to § 2339B where the underlying conduct involved disbursement of propaganda and training materials over the internet); *United States v. Osadzinski*, 2021 WL 32609671 at *1-3 (N.D. Ill. July 7, 2021) (rejecting vagueness challenge to the material support statute where the underlying conduct involved providing translation services and a computer script that facilitated the preservation of ISIS material online); *United States v. Guerra Blanco*, 1:20-CR-20245-RNS (S.D. Fla. Jan 28, 2022) (Defendant directed pro-ISIS media groups focused on producing Spanish-translated ISIS media, was charged with attempt under § 2339B, and was sentenced to 16 years in prison).

The Defendant's prior knowledge of the plea from ISIS of the "key and pivotal role" played by online media supporters, illustrates that the Defendant knew that ISIS itself called for and highly valued the very services that he is charged with attempting to provide. Accordingly, if the Defendant believed the FTO considered the services he provided to be material, it is difficult for the Defendant to claim that he could not have known that these services would constitute material support.

Moreover, the Defendant took actions to avoid detection by law enforcement. In his communications with the FBI OCE regarding the conduct alleged in the indictment, the Defendant not only engaged in "secret" Telegram chats (end-to-end encryption), but also utilized the "self-destruct" feature (chats deleted after a specified period of time) and the "clear chat" feature (deletes chats in real time) during his conversations with the FBI OCE. This further demonstrates that the Defendant was aware that the services he was attempting to provide were illegal. Thus, the statute—as applied to the Defendant—is not void for vagueness.

16

## II.     The Defendant's Conduct Is Not Protected by the First Amendment

The Defendant asserts that the charge contained in the indictment violates his rights under the First Amendment because his alleged criminal conduct "does not facilitate terrorist attacks, or make them any more likely…." (Doc. 59 at 24.)  The Defendant's position has no merit.

Critically, the Defendant's First Amendment argument misapprehends the material support statute.  Speech in the form of services coordinated with an FTO, is not protected First Amendment activity.  The Supreme Court has distinguished between independent advocacy, which is protected speech, and "advocacy performed in coordination with, or at the direction of, a foreign terrorist organization," which is not protected.  *Humanitarian Law Project*, 561 U.S. at 26.  When material support takes the form of speech, "the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*.

As the Supreme Court recognized, if the service provided was not done as independent advocacy but in coordination with the FTO, then the interest of the government in prohibiting the conduct outweighs any speech protections the conduct may be afforded in other circumstances. "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35.

The government has a compelling interest in regulating such speech; specifically, the protection of our national security by starving a terrorist organization of resources. "Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order." *Id*. at 28.  "The 'foreign terrorist organization' designation means that the Executive

17

Branch has determined—and the D.C. Circuit, in choosing not to set aside the designation, has concluded that the determination was properly made—that materially supporting the organization is materially supporting actual violence." *United States v. Afshari*, 426 F.3d 1150, 1160 (9th Cir. 2005); *United States v. Warsame*, 537 F. Supp. 2d 1005, 1016 (D. Minn. 2008) ("While the prohibitions of § 2339B may include some limited expression protected under the First Amendment, the Court cannot conclude that § 2339 punishes a substantial amount of free speech in relation to its plainly legitimate sweep.")

The Defendant's alleged conduct is directly connected to the government's compelling interest. First, ISIS is a designated FTO. Second, the "Bleeding Campaigns" video, which documented ISIS's military operations in Egypt, was published by ISIS in order to promote its cause. By translating it into English, the Defendant's conduct would clearly enable the video to be consumed by a wider, English-speaking audience. Finally, as the Defendant was well aware, ISIS relies upon its supporters throughout the world to assist ISIS in spreading its message online. By attempting to provide translation services to ISIS free of charge, the Defendant's conduct would have allowed for ISIS to devote its resources to other, potentially violent actions. *See Humanitarian Law Project*, 561 U.S. at 30 ("[Material] support frees up other resources within the organization that may be put to violent ends.").

The Defendant also asserts that the material support statute is not narrowly tailored to address the government's compelling intertest in combatting terrorism because, in his view, his conduct managing ATP which involved "translat[ing] a hundred ISIS releases, publish[ing] them on his website, [spread]ing them" is "protected" under the material support statute. (Doc. 59 at 21.) As mentioned earlier, the government disagrees with the Defendant's conclusion that this activity is protected under the material support statute. Again, while the Defendant has not been

charged with this conduct, it does not necessarily follow that such conduct is "entirely independent[]" of ISIS. 18 U.S.C. § 2339B(h).

Regardless, the Defendant's alleged criminal conduct on behalf of ISIS involved providing translation services, not expressive conduct. The alleged criminal conduct falls squarely within Congress's prohibition on providing material support, which includes only a "narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Humanitarian Law Project*, 561 U.S. at 26. The Defendant's First Amendment challenge should be denied.

## III. The Defendant's Motion to Dismiss Due to Entrapment Should Be Denied

The "central inquiry" for entrapment is whether law enforcement "implanted a criminal design in the mind of an otherwise law-abiding citizen" or whether they "merely provided an opportunity to commit a crime to one who was already predisposed to do so." *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010) (quoting *United States v. Pernell*, 737 F.2d 521, 534 (6th Cir. 1984)). A valid entrapment defense "requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *Id*. (quoting *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002)). Importantly, to succeed on pretrial motion to dismiss due to entrapment, "the undisputed evidence must demonstrate a 'patently clear' absence of predisposition." *United States v. Harris*, 9 F.3d 493, 498 (6th Cir. 1993) (quoting *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991)).

The Defendant's motion seeks dismissal of the indictment due to entrapment as a matter of law. At its core, the Defendant's argument is that the government induced him to commit a crime, and "[t]here is zero evidence the Defendant was predisposed to provide material support

19

to ISIS."[3] (Doc. 64 at 15.)  The government respectfully disagrees on both points.  The

government merely provided the Defendant an opportunity to commit the crime and there is

ample evidence of predisposition.  Since, at a minimum, there are disputes regarding the

evidence related to entrapment, the Court should deny the Defendant's motion.

A.    The government did not induce the Defendant to commit a crime he was
      predisposed to commit.

1.    *Inducement*

"Where a person is ready and willing to break the law, the mere fact that government

agents provide what appears to be a favorable opportunity, or participate themselves, in the

offense itself, is not entrapment." *United States v. McLernon*, 746 F.2d 1098, 1109 (6th Cir.

1984) (quoting district court instructions with approval).  Inducement therefore requires

"something more that 'merely afford[ing] an opportunity or facilities for the commission of the

crime.'" *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011) (quoting *Mathews v. United

States*, 485 U.S. 58, 66 (1988)).  It requires "an 'opportunity' *plus* something else – typically,

excessive pressure by the government upon the defendant or the government's taking advantage

of an alternative, non-criminal type of motive." *United States v. Dixon*, 396 F. App'x 183, 186

(6th Cir. 2010) (emphasis in original) (quoting *United States v. Gendron*, 18 F.3d 955, 961 (1st

Cir. 1994)).

Three cases illustrate the pressure required to establish entrapment as a matter of law.  In

each, the government exploited non-criminal motives over an extended period of time to

---

[3] The Defendant advances these same arguments in support of his assertion that the
government's conduct in this case violated the Attorney General's Guidelines on Federal Bureau
of Investigation Undercover Operations and the Attorney General's Guidelines for Domestic FBI
Operations (collectively, the "AG Guidelines").  The government disagrees.  In any event, the
AG Guidelines are not, in any manner, germane to the entrapment analysis.

convince the defendant to commit the crime. In *Sherman v. United States*, 356 U.S. 369 (1958), a government informant met the defendant at a doctor's office where they were both being treated for drug addiction. 356 U.S. at 371. They discussed their mutual experiences dealing with addiction, and the informant indicated that he was not responding to treatment and was suffering. *Id*. Appealing to the defendant's sympathy, the informant asked the defendant multiple times over several months for help procuring drugs. *Id*.

In *Jacobson v. United States*, 503 U.S. 540 (1992), the defendant ordered child pornography after being targeted for twenty-six months by government mailings purporting to be from "an organization founded to protect and promote sexual freedom and freedom of choice." 503 U.S. at 550, 552. Through those mailings, the government "exerted substantial pressure on [the defendant] to obtain and read such material as part of a fight against censorship and the infringement of individual rights." *Id*. at 552.

In *McLernon*, an undercover agent and the defendant became "blood brothers" and often stated that they loved each other. 746 F.2d at 113. After eight years of close friendship, the agent said his life was in danger from the mob and asked the defendant to engage in a drug deal to ensure that the agent did not get killed. *Id*. at 1114.

The inducement alleged by the Defendant is unlike the inducement in *Sherman*, *Jacobson*, and *McLernon*. The Defendant asserts that the FBI OCE "subjected [the Defendant] to numerous pleas of need and sympathy." (Doc. 64 at 16.) These "pleas of need and sympathy" consist of the following three statements made by the FBI OCE over a 6-day period, only two of which occurred prior to the Defendant agreeing to assist with the translation: (1) "It's just you are the best with translations I know, and I don't want to disappoint the diwan" (*Id*. at 10); (2) "Bro, any help you can give me with editing I really appreciate because I don't want to

21

disappoint the diwan with a bad translation and I know the bro is having a hard time with some parts" (*Id*. at 11); and (3) "I will be honest with you akhi ak habib (my beloved brother), I've had to ask so much because we need your help; and I am worried. I don't want to do a bad job for the diwan, and without you I am worried" (*Id*.).

These statements by the FBI OCE do not rise to the level of excessive pressure required for entrapment. Moreover, the sympathy invoked by the FBI OCE was related to his purported desire to good work for ISIS, not for some non-criminal type of motive. At no time was the Defendant paid for providing services to ISIS.

2. *Predisposition*

Predisposition is the defendant's "readiness and willingness" to commit the crime in question. *United States v. Lasuita*, 752 F.2d 249, 253 (6th Cir. 1985). The five factors relevant in determining predisposition include: (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion by the government. *Barger*, 931 F.2d at 366.

Contrary to the Defendant's assertion that "[t]here is zero evidence" of predisposition, the evidence in the case and even the Defendant's own statements in his motions to dismiss establish ample evidence of predisposition. By way of example, the Defendant has spent most of his time over the past several years working on the translation and dissemination of pro-ISIS and official ISIS material as the leader of ATP. The Defendant attempts to exclude his work for ATP from a predisposition analysis by asserting that all of his work for ATP was lawful. For reasons already

discussed in this response, the government does not agree with that contention. But, in any event, no court has concluded that the government is limited to evidence of criminal activity to prove predisposition. Predisposition evidence is evidence that demonstrates the defendant's "readiness and willingness" to commit the crime. *Lasuita*, 752 F.2d at 253. And as the Defendant has asserted, "the alleged illegal activity closely resembles the legal activity [the Defendant] engaged in for years." (Doc. 59 at 9.)

In addition, the Defendant maintained a heightened awareness of the law enforcement's use of undercover agents in terrorism investigations and has stated publicly that he was aware that he was under investigation. Within ATP's private group on Telegram, the Defendant reviewed messages received by other members and made statements like, "Tell me this doesn't sound like a cop" and "every fbi sting I have seen, they try to connect one person to…" and "Dude he is a cop." Also, during an interview with FBI agents in 2015, agents asked if the Defendant had encouraged anyone to conduct an attack or sent any money overseas. The Defendant's response was, "No. Cause that'd be super bait."

In October 2020, another ATP private group member posted a news update about another defendant's arrest for providing material support to ISIS, along with the comment, "Abu Zahra [kunya for other defendant] was from Muntasir Media… may Allah be with him." The Defendant replied, "Federal prosecutors say, since the FBI's investigation into Guerra began in October 2019, he had communicated with three different online covert employees, and pursued two of them romantically," and "There's more to the story / Attempted to provide material support means they set him up." And in a recent interview with the media from jail, the Defendant stated that he lived expecting to be arrested for the past few years.

To be clear, at this time, the government is not asking the Court to preclude the Defendant from offering an entrapment defense. The government is simply describing potential predisposition evidence in order to demonstrate that there are disputed evidentiary issues related to the entrapment defense.

B.    The issue of entrapment should be left to the jury.

"[W]ell established precedent makes it clear that the question of entrapment is generally one for the jury, rather than for the court." *Schaffer*, 586 F.3d at 426. "It is seldom appropriate to grant a pre-trial motion to dismiss based on an entrapment defense, because the defense focuses on a defendant's state of mind, an evidentiary question." *Id*.

A defense motion to dismiss due to entrapment may be granted only where "the undisputed evidence [demonstrates] a 'patently clear' absence of predisposition." *Id*. (quoting *Harris*, 9 F.3d at 498)). Moreover, a court should "not accept statements made in defendant's brief to establish entrapment as a matter of law," and even if there is an evidentiary hearing, the court "may not choose between conflicting testimony or make credibility determinations." *Id*.

Because the undisputed evidence does not establish a "patently clear" absence of predisposition, the Defendant's motion to dismiss due to entrapment should be denied.

**CONCLUSION**

For the reasons stated herein, the Defendant's Motion to Dismiss the One-Count Indictment Founded on the Void-for-Vagueness and Overbreadth Doctrines (Docs. 58, 59) should be denied, and specifically with respect to vagueness, should be denied without prejudice to renew after the government presents its case-in-chief at trial. In addition, the Defendant's Motion to Dismiss Due to Entrapment as a Matter of Law (Doc. 64) should be denied because the issue of entrapment should be left for the jury.

Respectfully submitted on March 8, 2022.

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

By: */s/ Casey T. Arrowood*
Casey T. Arrowood
Assistant United States Attorney
TN BPR No. 038225
800 Market Street, Suite 211
Knoxville, TN 37902
(865) 545-4167
Casey.Arrowood2@usdoj.gov