IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | NO.: 3:21-CR-38-KAC-DCP |
| | ) | |
| BENJAMIN ALAN CARPENTER | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT FOR VAGUENESS, OVERBREADTH, AND ENTRAPMENT**

The Defendant, Benjamin A. Carpenter, *pro se* respectfully submits this Reply to the Government's Response to Defendant's Motions to Dismiss the Indictment for Vagueness, Overbreadth, and Entrapment. [Doc. 68].

The Plaintiff's response misses the mark on a number of points. To start, the Plaintiff suggests the "Defendant's vagueness and overbreadth challenges should be denied in light of the Supreme Court's decision in *Humanitarian Law Project v. Holder*, 561 U.S. 1 (2010)" [Doc. 67, p. 1] because it held "the term 'service' is not vague because 'a person of ordinary intelligence' would understand the term 'service' to cover advocacy performed in coordination with, or at the direction of a foreign terrorist organization" (*Ibid*, p. 1 quoting *Holder* at 24). Undoubtedly, this displays a misreading of *Humanitarian Law Project v. Holder*, 561 U.S. 1 (2010), along with a misunderstanding of the Defendant's vagueness challenge, as become clearer as one moves through the Plaintiff's response. The Defendant has not laid claim the term "service" is vague facially, which the Plaintiff seems to suggest, nor is he being accused of advocating in coordination with, or at the direction of, a foreign terrorist organization. But as applied to him the material-support statute is vague because none of the services mentioned in the statute clearly apply to him

1

and his alleged activity. Thus, the Plaintiff's claim and the "crux of the Defendant's argument is that 'service is unconstitutionally vague as applied to him because it is not defined in the statute while some sub-categories of 'material support or resources,' such as 'personnel' and 'expert advice and assistance,' are defined" (*Ibid,* p. 3) is not accurate.

The Defendant explained clearly why the term "service" is vague in its application to him:

> "Service," [. . . ] is unconstitutionally and impermissibly vague as applied to the Defendant since the statute explains "service" to include "personnel" and "expert advice or assistance." [. . .] On this point, the Indictment is self-defeating due to the simple fact it recognizes the alleged activity does not fall comfortably within the services of "personnel" or "expert advice or assistance" and thus sought to capture it with the broad and wide net of "services." But because "expert advice or assistance" and "personnel" are vague as applied in the instant case, "service" must by necessity be vague as applied as the latter incorporates the former two.

[Doc. 59, p. 14].

This is the reason the terms "personnel" and "expert advice or assistance" were given considerable attention although they weren't mentioned specifically in the Indictment; they are the only services the alleged activity could possibly fall under. The Plaintiff in its responses claim the Defendant attempted "to provide material support in the form of translation services . . ." [Doc. 68, p. 2). This begs the question, under the material-support statute, what type of service would this fall under? Depending if the service was done "under that terrorist organization's direction or control" it could fall under "personnel" (*See*, 18 U.S.C. 2339b(h)); or, if it was "derived from scientific, technical or other specialized knowledge" (*See*, 18 U.S.C. 2339A(b)(3)) it "*may* qualify as 'expert advice and assistance'" (Doc. 68, p. 13) (emphasis added) or it may not – i.e., it would be vague, as the Plaintiff recognizes.

Instead of arguing the alleged activity falls under one or both of the services mentioned in the statute, the Plaintiff is relying on an erroneous reading of the Supreme Court's ruling in

2

*Humanitarian Law Project v. Holder*, 561 U.S. 1 (2010). That is due to failing to understand the context in which the Supreme Court explained the term "service" as "concerted activity." *Holder*, at 24. Context shows the Supreme Court was stating independent advocacy in support of a foreign terrorist organization cannot be deemed a "service" under the material-support statute; rather, it "refers to concerted activity, not independent advocacy." *Ibid*, at 24. Thus, if someone independently advocated for a foreign terrorist organization, even if it was derived from scientific, technical, or other specialized knowledge, it would not be considered a prohibited service unless it was to a foreign terrorist organization – i.e., unless there was a coordinated effort. This is the crux of the Supreme Court explanation vis-à-vis "service."

The understanding the Plaintiff is proposing is that any activity that may be "concerted" is a prohibited service, regardless of if it falls under "personnel", "expert advice or assistance," or "training." For example, according to the Plaintiff's interpretation, if someone imparted general knowledge or unspecialized assistance to a foreign terrorist organization it would be a "service" simply due to it being "concerted activity." But this not what the Supreme Court intended to be taken from its ruling, and the statute itself refutes that and qualifies the type of services it proscribes. Limiting the inquiry to whether the activity was concerted or not ignores the qualifications outlined in the material-support statute and explained in the seminal Supreme Court ruling.

As it relates to the instant case, indeed, the inquiry should rest upon if enough direction or coordination existed and whether the alleged assistance was derived from scientific, technical, or other specialized knowledge. It also needs to be explored if the service was significant – i.e., if it was material. This makes the most sense in light of the material-support statute, the Supreme Court ruling in *Holder*, and the intent Congress had in legislating the statute.

And since it appears the Plaintiff is suggesting otherwise and the alleged act of editing an already completed translation, even if the Plaintiff proves through evidence at trial, would at most vaguely fall under Title 18 U.S.C. § 2339B, a trial on the facts is not necessary as the issue is clearly a matter of law for the Court. Federal Rules require that "a motion alleging a defect in instituting the prosecution" (F.R.C.P. 12(b)(3)(A)) or "a motion alleging a defect in the indictment or information" under Rule 12(b)(3)(B) must be raised pretrial. *See also*, *United States v. Vanderberg,* 358 F.2d 6, 10 (7th Cir. 1966). The Plaintiff, in contrast, opines the Defendant's "claim is not yet ripe for adjudication" (Doc. 68, p. 4). The Defendant respectfully disagrees; courts have traditionally and historically decided vagueness challenges to the material-support statute's application pre-trial; and there is no reason this case should be any different.

The Plaintiff claims the Defendant's vagueness challenge would fail anyways because "the Defendant was fully aware that ISIS was a designated FTO and providing material support to ISIS was illegal" (*Ibid*, p. 5). The Defendant did not claim otherwise. In fact, he stated he understood prior to being indicted that if he worked for ISIS's media department, he would likely face prosecution (*see* Doc. 59, p. 10). The Plaintiff claims that "argument is contradicted by the Defendant's own statements [. . .] during the post-arrest interview [. . .] that the Defendant is aware that if ISIS directed him to publish a newsletter, such conduct would be illegal even without him working within ISIS's media department" [Doc. 68, p. 7]. If the Defendant published a newsletter under the direction or control of ISIS, that would constitute working within ISIS's media department. Such conduct would clearly constitute "material support" in the form of the service of "personnel," which is defined as providing a person "to work under that terrorist organization's direction and control." § 2339B(h). Thus, there is no contradiction; what the Defendant stated in his post-arrest interview is simply an example of working within ISIS's media department.

4

However, the Plaintiff's arguments and statements are full of contradictions and inconsistencies. For instance, the Plaintiff states the "Defendant is charged with attempting to provide material support and resources, namely services to ISIS, not personnel" [Doc. 68, p. 10], yet states the Defendant attempted to provide "an English translation at ISIS's *direction*" (*Ibid,* p. 5) (emphasis added). The Plaintiff also states in multiple places, inside and out its response, that the Defendant attempted to provide "services" in the plural when the actual activity involves a "service" in the singular.

The Plaintiff further claims, "the Defendant and at least one other ATP member, over the course of approximately two weeks, provided a significant amount of translation work to complete the English-language transcript of the "'Bleeding Campaigns' video" (*Ibid*, p. 9). This is contradicted by the testimony of one of its own agents:

> 74. On or about February 7, 2021, FBI OCE 1 sent a more completed English translation and an Arabic transcript to [the Defendant] [. . .] These versions had timestamps added to match the times in the video. [. . .]
>
> 77. On or about February 14, 2021, [the Defendant] sent FBI OCE 1 a Microsoft Word document containing a complete English translation of ISIS's "Bleeding Campaigns" video[.]

Smith, Affidavit in Support of an Application for a Search Warrant, p. 25.

His testimony in support of a search warrant makes clear it is the Plaintiff who provided "a significant amount of translation work to complete the English-language transcript of the 'Bleeding Campaign' video," not the Defendant. In addition, the "role" the Defendant played was over the course of approximately one week, not two.

It is the Plaintiff who is attempting to exaggerate the nature of the Defendant's conduct in order to support its argument and case against the Defendant. The Defendant did not (1) translate the video; (2) make an Arabic transcript of the video; or (3) provide timestamps to match the times

5

of the video. The Plaintiff did all of that, not the Defendant. The Defendant stands accused of attempting to provide "material support" via the provision of "the edited translation" [Doc. 68, p. 9].

Underscoring the Plaintiff's faulty understanding and application of the material-support statute as it relates to the instant case, along with its misunderstanding of the Defendant's argument is it claims

> The Defendant is arguing that the material support statute is vague as applied to him because there was no actual connection between the FBI OCE and ISIS, [and] [e]ven if he were [sic] charged under "personnel," the government does not have to allege or prove any formal employment relationship.

[Doc. 68, p. 10].

The Defendant never argued the material-support statute is vague "because there was no actual connection between the FBI OCE and ISIS." His argument rests on the question if an act done through an intermediary constitutes a "service" vis-à-vis the material-support statute – a question the Supreme Court in *Holder* did not answer. As it relates to the instant case, it's apparent the Defendant thought the FBI OCE was working under the direction and control of ISIS – that really can't be disputed. And if the Defendant had the role of the FBI OCE, i.e., working under the direction and control of ISIS, he would be violating the statute's prohibition of providing the service of "personnel." But he is not and was not working under the direction and control of ISIS. An illustration makes clear the Defendant's argument:

The Alleged Relationship Between the Defendant and ISIS



Is that enough direction or coordination necessary for an activity to constitute a "service"? B's role would be in the form of the service of "personnel." A's position in the relationship is not clear. Everything is not always black and white. As it relates to the qualifications of the service of "personnel," such a relationship falls short of criminal liability, since, in stark contrast to the Plaintiff's claim quoted above, "it requires, in the context of Section 2339B, an employment or employment-like relationship between the persons in question and the terrorist organization[.]" *United States v. Lindh*, 212 F. Supp. 2d 541. *See also, United States v. Marzouk*, 383 F. Supp. 2d 1056 (stating personnel under 2339B requires an employment or employment-like relationship).

In addressing the Defendant's vagueness challenge as it pertains to the service of "expert advice or assistance" the Plaintiff relies on the Defendant's activity within Ahlut-Tawhid Publications (ATP) and the "other specialized knowledge" qualification in the definition of "expert advice or assistance." As it relates to the Defendant's work within ATP, it does not follow that just because he translated and edited multiple works in the past that he automatically and clearly fits the description outlined in the definition of "expert advice and assistance." The Defendant is a novice who has only begun learning to translate a few years ago. It does not take an expert linguistic to notice and point out bad English or a translation done by a person not fluent in English – as the Plaintiff seems to suggest by pointing out the Defendant's critique of certain translations. The example the Plaintiff presented is inapposite and inaccurate, as well. "Clarifying Matters of Methodology" is ATP's publication. It is a translation and adaptation of a six-part series released by ISIS through its radio, then published in parts within its newsletter. And as the Plaintiff states, the Defendant did not translate it. It was a group effort. The Defendant's role was management and editing the translations of others into better flowing English.

7

The Plaintiff's disagreement with the Defendant's "conclusion that his work for ATP constitutes 'legal activity'" [Doc. 68, p. 13] is illogical and further highlights its misunderstanding of the material-support statute. Does the Government like the work of ATP? No. Does the Government want to silence ATP and the Defendant? Yes. However, what is lawful and unlawful does not turn on what the Government likes and dislikes. The Defendant was under intense investigation for multiple years, with Federal grand juries opened and closed, and had his private group-chat infiltrated by an FBI employee without any charges being brought about except after government creative activity.

The Plaintiff's argument and examples pertaining to the Defendant's knowledge vis-à-vis the importance of media misses the mark. For instance, the Plaintiff's continued reliance on the Defendant's statement that he wages "jihad with pen not a sword" proves nothing except that he strives to raise the word of God by explaining and spreading the authentic creed. The Defendant is an independent actor observing the world around him and values information and knowledge. The Defendant never published, spread, posted anything anywhere at ISIS's direction or control. Him reviewing a video by ISIS discussing the importance of media and its supporters around the world is exactly that: a review. ATP and the Defendant translated and published any work that elucidated the correct creed; some of those works were released by ISIS in Arabic. ATP is an Islamic group with the goal of spreading the correct creed. ISIS is an Islamic group with a wider expanse of goals. The Defendant and ATP deals with matters in the academic realm and should be free to translate, release, discuss whatever it wants without the government targeting him and it.

Again, the Plaintiff attempted to exaggerate the Defendant's conduct by equaling it with the material support Congress intended and with other material support prosecutions. [Doc. 68, p. 15]. First, the Plaintiff takes the alleged activity as "material support" for granted and relies on the

8

reflection "that any form of material support [except for medicine and religious materials] furnished 'to' a foreign terrorist organization should be barred." *Holder*, 561 U.S. 1 at 30. The original argument made by the Defendant in his memorandum still stands (*See*, Doc. 59, pp. 14-16). Second, all the cases the Plaintiff cited involved additional conduct other than translation and spanned years in most cases.

The Plaintiff continued to exaggerate by claiming the Defendant attempted to provide the "highly valued" services "ISIS itself called for" [Doc. 68, p. 16]. Again, the Defendant is accused of doing one thing: editing one translation. That is not "significant," "valuable," "material."

As far as the Defendant using end-to-end encryption in his communications with the FBI OCE, it does not necessarily follow that he was aware his alleged conduct was illegal. When the Defendant was asked if the reason he was hesitant in helping the FBI OCE was due to the disbelievers around him (i.e., the FBI), he replied in the negative. In addition, the FBI OCE initiated most chats within the secret-chat function of Telegram. There was nothing out of the ordinary. Telegram made its platform privacy-friendly for user to use its privacy-friendly features, especially for activity certain governments do not like but not inherently illegal.

Like with the Plaintiff's opposition to the Defendant's vagueness challenge, the Plaintiff misapprehends the issues surrounding his overbreadth challenge. The Defendant is not challenging or claiming material support in the form of speech is protected First Amended activity; he is arguing that his alleged activity of editing an ISIS video "does not further terrorist conduct nor undermine United States foreign policy" [Doc. 59, p. 20].

The Plaintiff claims its interest is nevertheless implicated because "ISIS is a FTO" and the video the Defendant is accused of editing its English version of promotes its cause. "By translating it into English," the Plaintiff argues, "the Defendant's conduct would clearly enable the video to

be consumed by a wider, English-speaking audience" [Doc. 68, p. 18]. This argument rests on a slippery slope. It, along with its contention ATP's activity is illegal, highlights the Plaintiff's willingness to press boundaries. Under such an argument the authors and translators of The ISIS Reader, a widely published book containing a plethora of ISIS translations, including the ISIS publication "You Are a Mujahid, O Media Man!", would be implicating the Plaintiff's interest because "ISIS is a FTO" and by translating all those releases and publications into English their conduct "would clearly enable those releases to be consumed by a wider, English-speaking audience." Additionally, they were well-aware ISIS called on others to assist in spreading its message, as they translated and published such a call in their book.

Finally, the Plaintiff opposes the Defendant's entrapment motion because, "at a minimum there are disputes regarding the audience related to entrapment" [Doc. 68, p. 20]. However, it is the facts that need to be disputed, which are not in the instant. The Plaintiff merely disputes the fact the elements of entrapment exists.

The Plaintiff objects to the Defendant being induced because, according to its claim, inducement is only "excessive pressure." The Plaintiff also downplays its involvement by arguing the FBI OCE only plead for the Defendant's help "over a 6-day period" [Doc. 68, p. 21]. First, inducement is not restricted to "excessive pressure;" it "includes soliciting, proposing, initiating, broaching or suggesting the commission of the offense charged." *Sherman v. United States*, 356 U.S. 369 (1958) (Hand, J., concurring). Second, the Defendant was subject to a years-long undercover operation where the FBI OCE attempted to have the Defendant clearly violate the material-support statute before the "6-day period." When that didn't work, i.e., when the Defendant said he didn't want to work for ISIS, the Plaintiff's scheme turned more sinister, creative, and vague in order to prosecute a law-abiding citizen. And the fact of the matter is: minus

10

the creative activity of government employees the Defendant would never have attempted to provide "material-support" to ISIS. The predisposition of the Defendant proves this.

For "evidence" the Defendant was predisposed the Plaintiff uses the Defendant's awareness "he was under investigation" and "that he lived expecting to be arrested for the past few years" [Doc 68, p. 23]. How any of that is relevant to the question of predisposition is uncertain; nevertheless, the Defendant knew the government wanted to silence him for his work, which included much more than "the translation and dissemination of pro-ISIS and official ISIS material as the leader of ATP."[1]

In addition, the Plaintiff states "no court has concluded that the Government is limited to evidence of criminal activity to prove predisposition" [Doc. 68, p. 23]. However, the Supreme Court in *Jacobson v. United States,* 503 U.S. 540 (1992) concluded "a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." 503 U.S. 540 (1992).

The Defendant is confident that if this Court was to examine the undisputed facts in this case that it would fall squarely within the purview outlines in *Jacobson*, 503 U.S. 540. Likewise, the Defendant is certain that when the Court looks solely at the Defendant's alleged conduct for which he was indicted for, the Court will determine the material-support statute is being spread too broadly to encompass his alleged conduct and does not fall comfortably within the scope of the material-support statute.

Wherefore, the Defendant's motions to dismiss due to vagueness, overbreadth, and entrapment should be accepted.

---

[1] As mentioned previously, ISIS related material released by ATP made up roughly 20% of its overall work. ATP translated and published many works by God's grace – which included some ISIS releases. It did not restrict or dedicate itself only to ISIS or pro-ISIS material.

Respectfully submitted this 15th day of March 2022.

   /s/ Benjamin A. Carpenter
BENJAMIN A. CARPENTER

12

Case 3:21-cr-00038-KAC-DCP   Document 70   Filed 03/15/22   Page 12 of 12   PageID #: 567