UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BENJAMIN ALAN CARPENTER<br>a/k/a "Abu Hamza" | Case No. 3:21-cr-38<br><br>Judge Crytzer<br>Magistrate Judge Poplin |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

In the words of ISIS, it is "no exaggeration" to say that the Defendant "is a suicide bomber without a belt."

Unlike a suicide bomber, however, the Defendant's conduct was not limited to a single instance of discrete harm. For years, his global digital media operation translated and produced pro-ISIS propaganda – propaganda the terrorist organization loudly advertises as of critical importance to its core mission – and then pushed it to every corner of the world.[1] Until his arrest, the Defendant was a leader in an international media war waged by ISIS against the so-called "West"; a war that, from ISIS's very inception, it considered every bit as important as its physical, kinetic killing operations.

When presented with the apparent opportunity to work directly with ISIS, the Defendant jumped at the chance. He leveraged his group to complete a task he believed ISIS desperately needed; a product he was told by a notional ISIS operator to be "very important" to the terror group's mission. He showed no qualms about working with and directly for ISIS, even offering

---

[1] "ISIS," as identified in the Second Superseding Indictment, is the Islamic State of Iraq and al-Sham and its various iterations and aliases.

to complete a new product of his own choosing, which he believed to be more important than the task he had been assigned.

The Defendant has shown no remorse for his actions and neither a capacity nor desire to rehabilitate. On the contrary, he has demonstrated a continued commitment to assisting ISIS from his current station and in the years to come, furthering a perceived global war against the "crusader West" and aiding in the propagation of terror throughout the world.

The factors articulated in 18 U.S.C. § 3553(a) call for the Guidelines-recommended sentence identified by the Defendant's presentence investigation report, which is itself 33% lower than the Guidelines range would be were it not limited by statute. The Court should sentence the Defendant to a term of 240 months' imprisonment.[2]

## BACKGROUND

On March 15, 2023, a Grand Jury of the Eastern District of Tennessee returned a Second Superseding Indictment (the "Indictment") against the Defendant, Benjamin Alan Carpenter, also known as "Abu Hamza." (Doc. 108). The Defendant was charged with one count of attempting to provide material support to a designated foreign terrorist organization ("FTO"). Specifically, the Indictment alleged that he provided services (and more specifically, translation services) to ISIS, including its alias Al Hayat Media Center ("Al Hayat"). The Defendant elected to try his case before a jury of this Court. On October 19, 2023, the jury returned a guilty verdict. (Doc. 190).

---

[2] On June 5, 2024, the Defendant submitted a sentencing memorandum and written motion for variance. (Doc. 223). The United States anticipates responding to the Defendant's motion for variance at least two days before the sentencing hearing in this case (i.e., on or before June 18, 2024).

On April 3, 2024, the United States Probation Office filed a presentence investigation report ("PSR"). (Doc. 215). Thereafter, on April 17, 2024, the Defendant objected to the PSR. (Doc. 218). The United States responded to those objections. (Doc. 222).

Based upon a total offense level of 38 and a Criminal History Category of VI, the Defendant would face a Sentencing Guidelines range of 360 months' imprisonment to Life. (PSR, ¶ 56). However, because the statutorily authorized term of imprisonment is no greater than 20 years, his effective Guidelines range is 240 months. (*Id.*).

Any variance or departure from the Defendant's Guidelines range would run counter to the pertinent statutory considerations at 18 U.S.C. § 3553(a). Accordingly, the Court should impose the sentence provided by the statutorily limited Guidelines: 240 months' imprisonment.

## ANALYSIS

As the Court is aware, its sentencing analysis is guided by 18 U.S.C. § 3553(a), and the sentence it imposes must account for the factors set forth therein, including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, protect the public, and afford adequate deterrence. The facts now before the Court touch on a variety of these factors simultaneously. Consequently, rather than discuss them each individually, the United States addresses the sentencing considerations in separate contexts, including:

i. The Defendant's history and role with his group of media *munasirin*, the entity by which he realized his attempted material support for ISIS, a foreign terrorist organization;

ii. The offense of conviction itself; and

iii. The Defendant's remorseless and obstructive behavior throughout.

3

In each context, the pertinent sentencing factors demonstrate that the appropriate sentence in this case is 240 months' imprisonment, just as commended by the United States Sentencing Guidelines.

I.     *The Defendant's Conduct and Role as a Leading ISIS Media Munasirin Militates Strongly in Favor of a Guidelines Sentence.*

The Defendant was the leader of an international group of media operatives whose sole mission was to assist ISIS in a way that ISIS deemed critically important. For years, he acted as a media *munasirin*, offering his own support and that of his radical cohort in creating media products, fawning over and propounding ISIS's message of terror, translating jihadist works, gleefully recounting the deaths of civilians and American soldiers, and urging the world to violent jihad against the United States and its allies.

This offense calls for the imposition of meaningful consequences. The Guidelines provide for such consequences in the form of a 240-month term of imprisonment. The United States concurs and submits that a Guidelines-endorsed sentence is appropriate.

As a threshold matter, the Defendant previously claimed that his past conduct with Ahlut Tawhid Publications ("ATP") was lawful, First-Amendment-protected activity. The United States makes no such concession. The fact that the Government elected to charge him as reflected in the Indictment has no bearing on the criminality of his prior actions.

In any event, such a claim makes no difference here. At sentencing, "[t]he government may hold defendants to account for what they say if that speech and related conduct reveals a criminal element, a motive, or a factor that aggravates a sentence." *United States v. Rayyan*, 885 F.3d 436, 441 (6th Cir. 2018) (citing, *inter alia*, *Wisconsin v. Mitchell*, 508 U.S. 476 (1993)). In *Rayyan*, after a defendant's conviction for violating 18 U.S.C. § 922(a)(6) & (g)(3), the Sixth Circuit affirmed a substantial upward variance imposed in part because of a defendant's pro-ISIS

online viewing habits and statements. *See id.* ("The content found in Rayyan's messages, phone, and social media profiles all directly related to the § 3553(a) analysis: It shed light on what sort of danger Rayyan presented to the public, how severe his conduct was, and what kind of sentence would be needed to deter other individuals from heading down the same path."). Here, the Defendant's work with ATP and the nature and stunning volume of terrorist content he consumed, regurgitated, produced in multiple languages, and distributed worldwide in the years leading to his arrest speaks plainly to the severity of his conduct, his intent and motivations, the danger he presents to the public, and the need for deterrence, among other pertinent considerations. *See id.*

As adduced at trial, in the years preceding the conduct that forms the basis for Count One of the Indictment, the Defendant founded and proudly served as the *emir* of ATP, one of the world's most prolific pro-ISIS media organizations. ATP translated and produced pro-ISIS material and distributed it internationally and in various languages. As the Defendant well knew, this service was of key importance to ISIS. It was also a service for which he was all-too-ready to take credit, claiming personal responsibility for ATP media products and telling FBI investigators after his arrest: "When you think of ATP, think of me." (Doc. 210 at 161; *see* GX 106-j).[3]

---

[3] For the sake of clarity, this memorandum refers to documents filed on the Court's electronic record by document number and intra-document page number provided by the Court's electronic case filing system. It refers to the United States' trial exhibits using the abbreviated identifier: "GX," followed by the exhibit number as logged in the Court's jury evidence review system and page number assigned by that system, e.g., "GX 106" being a video of the Defendant's post-arrest interview and "GX 48 at 4" being the fourth page of *From Dabiq to Rome #35*, irrespective of the document's original pagination. On a separate medium, the United States will submit to Court and to defense counsel copies of the trial exhibits referenced in this memorandum.

For the Court's reference, Doc. 189 in the Court's electronic record contains a list of each trial exhibit, followed by a textual description of that exhibit. Docs. 207-13 are trial transcripts.

Dr. Charlie Winter explained why the Defendant's conduct was so important to ISIS. From its very inception – since it was "even a tiny speck of an idea in the brain of Abu Musab al-Zarqawi" – the power of the media was an inherent and crucial tool in ISIS's arsenal of weapons. (Doc. 208 at 90). Videos and propaganda such as that produced by ATP – glorifying violence and globalizing the idea of terror – were used to win converts, recruit fighters, attract donors, and conduct psychological warfare in ways that were "core component[s]" of how ISIS engaged in its war. (*Id.*, 90-91).

This importance was made all the more profound in the late 2010's, when the United States and its allies successfully drove ISIS out of physical territories it had claimed as part of its Caliphate. At this point – notably, the same period in which ATP was becoming increasingly active – ISIS lost the facilities it needed for large-scale centralized media operations. It therefore began to rely heavily on its *munasirin*, i.e., "supporters" like the Defendant, to diversify its media economy and bring in support from other parts of the world. (*See id.* at 91-92). ISIS openly and frequently exhorted *munasirin* like the Defendant to do its bidding, lionizing them to the point of listing them as an official arm of the ISIS media governance structure. (GX 4).

ISIS proclaimed the Defendant and his ilk to be at the forefront of its war, responsible for inciting others to violent jihad. (*See* GX 7 at 202).[4] They are "part and parcel" of the war,

Finally, the memorandum will refer to any exhibits not admitted at trial but tendered for sentencing purposes as "GSX," followed by a numerical identifier. Those sentencing exhibits will be filed contemporaneously with this memorandum.

[4] GX 7 is *The ISIS Reader*, as found in the Defendant's possession and submitted to the Court as evidence at trial. For ease of reference, page 202 of the document begins the chapter entitled "Media Jihad," which itself is largely a translation of an ISIS-published document called, roughly "Media Operative, you are Also a Mujahid," sometimes, "You are Mujahid, O Media Man," or, as it was referred to in an ATP-branded graphic: "You are Mujahid, O Media Operative." (GSX 5)

working alongside the jihadists fighting on the ground. (Doc. 208 at 115-16). "All things considered, it is no exaggeration to say that the media operative is an *istishhadi* [suicide bomber] without a belt! This decoration is well deserved." (GX 7 at 204-05).

In view of the supreme importance ISIS places on the promulgation of terror through its messaging, this characterization of the Defendant makes sense. After all, "half of the battle is the media" and "verbal weapons can actually be more potent than atomic bombs." (*Id.* at 203). Analogized to the eternal and parallel rewards awaiting those who make an arrow, those who shoot it, and those who pass the arrow, everyone involved in the propagation of an ISIS media product – from production to inserting subtitles to distribution – is of significant and equal value to ISIS and its terror campaigns. (*Id.* at 205; Doc. 208 at 117-18). As the leader of ATP, the Defendant performed all three of these functions willingly, proudly, and routinely.

Consistent with the direction provided by ISIS to its adherents in its video *Inside the Khilafah 8* ("*Inside 8*") the Defendant did ISIS's bidding under the guise of an "independent contractor." Still, ISIS tasked him and his kind with listening, obedience, jama'ah (participating in the community), hijrah (migration), and jihad. (GX 8-b). Through each click of his mouse, he amplified ISIS's voice to reach millions. (GX 8-c). Supporting his Khilafah on the digital front, he continued his jihad behind his keyboard, striving to keep all the enemies of ISIS from enjoying a moment of sleep or living a pleasant life. (GX 8-g). He intended to terrorize Americans, filling them with fear, igniting the fires of conflict, and creating a climate of anxiety and distress. (*Id.*).

Though the Government accepts this characterization of the Defendant's activities, these words are not the United States'. They are ISIS's, drawn from a video produced by the Al Hayat Media Center, ISIS's official media wing (itself specifically designated by the United States as

an FTO) and the entity that the Defendant was convicted of attempting to materially support. The Defendant enthusiastically accepted his role as described.

In *From Dabiq to Rome* ("*DTR*") – the Defendant's pro-ISIS periodical of which ATP published over 70 issues – the Defendant commented approvingly on *Inside 8* and reiterated the importance of the work undertaken by ATP and other media supporters. (*See* Doc. 210 at 142-43; GX 48). He reiterated how critical media *munasirin* like he and ATP were in ISIS's war, calling them "knights on the digital front" who play a "key and pivotal role in giving support" to ISIS, and congratulating those *munasirin* who did not stray from the path laid out by *Inside 8*. (GX 48 at 4-5). The Defendant knew and advertised that the work he was doing was of meaningful value to ISIS, and he proclaimed that message to all who would listen.

In addition to highlighting the importance of the Defendant's actions in furthering ISIS's campaigns of terror, the Defendant's views articulated in *DTR* – along with the materials he consumed and produced in his role as ATP's leader – establish that his commitment to aiding ISIS is no mere lark. The Defendant taught himself Arabic over the course of several years. (*See, e.g.*, Doc. 211 at 70-71). Rather than put this hard-earned skill to good use for society, he used it to fully immerse himself in ISIS's ecosystem of terror. This speaks volumes as to the Defendant's deep and lasting commitment to ISIS's dictates. In conjunction with the other facts before the Court, it also informs his own history, characteristics, dangerousness, and need to be deterred and incapacitated.

As early as 2015, the Defendant was laughing about the gruesome execution of those who do not share his belief structure. (GX 32-35). Though there may have been a time that the Defendant would watch videos featuring blood and "get weird," years before he was finally brought to justice, he had graduated to laughing and eating meals while watching people get

beheaded. (GX 33). In conversations with his significant other, he hoped to be "blessed" with the release of a beheading video, which he thought were "special" because they "[c]ast fear in kuffar hearts" in a way that recorded executions with guns do not. (GX 32). In the event that such a video was released – including potentially one that recorded the execution of 130 captured prisoners by ISIS – he suggested that they watch together as a romantic endeavor, saying, "[y]ou had me at beheading." (Doc. 32).

Time did not temper the Defendant's views. Instead, he ramped up his consumption of violent and radical pro-ISIS material. When FBI personnel searched his digital accounts and hardware, they found hundreds upon hundreds of videos of the kind shown at trial (and worse). These videos – a sampling of which were previously submitted to the Court and incorporated herein by reference (*see* Docs. 145-46) – show beheadings, immolations, and other executions, combat footage, desecration of corpses, pro-ISIS rhetoric, calls to violence and terror, and the like. These macabre spectacles were mixed in with, among myriad other examples:

Treatises justifying the beheading of captives, e.g., GX 53,



ANSAR AL-KHILAFAH MEDIA

ARTICLE | 9 Safar 1437H

## The Issue Of Beheading
BY SHEIKH HUSSAIN BIN MAHMOOD
23 SHAWWAL 1435H

Government
Exhibit
3:21-CR-38
53

Ansar al-Khilafah

"Tips" for terrorists, including a command to "strike violently, and try to inflict the greatest losses on the enemy," e.g., GX 93,



and even ATP-branded products exhorting readers to violence and terror, e.g., GSX 5.



Ultimately, the Defendant banded together with others who shared his passion for supporting ISIS's aims of terror and formed ATP, a clearinghouse for pro-ISIS media products. In leading ATP and serving as its loudest voice, the Defendant published what is perhaps the group's most notable product, *DTR*, in which he glorified ISIS suicide bombers; celebrated the deaths of American and allied soldiers; lauded the "blessed raids in New York" (i.e., the attacks

on September 11, 2001); and urged readers to violent jihad, among other things. (*See* GX 45-48, GX 117, GX 118, GX 120).

Though *DTR* was noteworthy, it was not ATP's only endeavor. Under a banner proclaiming itself "Callers to the Authentic Creed," the group mass-distributed many high-quality videos, audio recordings, translations, missives, and other publications meant to defend and celebrate ISIS, denigrate "the West," or both. (*E.g.*, GX 12, GX 40, GX 44, GX 72, GX 80-82, GX 85, GX 90). Some, for example, brought critical ideological and policy ISIS documents – explaining who is "fair game for targeting an act of terrorism" – to English-speaking masses. (GX 12; Doc. 208 at 144). Others cursed the "evil scholars" who collaborated with and assisted governments opposed to ISIS. (GX 81). Still others warned Americans, "Zionists," and "worshipers of the cross" of destruction at the hands of ISIS in retaliation for government-sponsored conduct in the Middle East. (GX 80). In every case, evinced through scores of examples, the Defendant and ATP were the very "dictionary definition of what it is to be a *munasir* organization" for ISIS. (Doc. 208 at 145-46).

In that spirit, ATP was no mere band of harmless misfits espousing unpopular ideas. It comprised a collection of authentic ISIS jihadists and dangerous individuals from around the world, many of whom were arrested in their own countries for supporting terrorism. The Court has seen evidence of the Defendant's global reach; ATP's co-branded ISIS products were distributed throughout the world in multiple languages, including material in English, German, Russian, Spanish, and Urdu. (*E.g.*, GX 85-88; Doc. 211 at 133-38).

The Defendant ensured that this work would continue despite media companies' attempts to intervene. ATP went through several iterations. (Doc. 210 at 141). "A lot" of his accounts

were closed. (GX 106; GSX 1 at 119).[5] But he was relentless. Taking his cue from *Inside 8*, each time a web host would attempt to prevent the Defendant from broadcasting ISIS's message, he would reopen a new account to continue his work. (GX 8; Doc. 210 at 141-42). In so doing, he was happy to taunt those who stood in his way, writing to Twitter after one such suspension: "Hello, Twitter[.] I have already made another account. So die in your rage." (GSX 2; *see* GSX 1 at 118, Doc. 211 at 142).

In addition to its broad and relentless reach, the ATP roster included at least one card-carrying ISIS operative and leader: Mohamad Ameen. Ameen is the Defendant's ATP "brother," with whom the Defendant routinely communicated, who claimed that he was "there with [ISIS] in its birth."[6] (GSX 3; GX 106; GSX 1 at 129-132) He is also designated by name as a member of ISIS by the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC"), and a "recruiter and key leader for ISIS in Syria, Afghanistan, and the Maldives." (GSX 4). Ameen was arrested in the Maldives in 2019, nearly two years before the Defendant was himself apprehended. (*See, e.g.*, *Suspected Islamic State Recruiter Arrested in the Maldives*, RadioFreeEurope, Oct. 24, 2019, https://www.rferl.org/a/suspected-islamic-state-recruiter-arrested-in-the-maldives/30234732.html). The defendant was aware that Ameen was not merely arrested, but that he was a figure of importance within ISIS: "He's known. Like U.S. Government knows him." (GX 106; GSX 1 at 131-32). In other words, the Defendant knew that, for years, he was coordinating with at least one key ISIS leader directly by way of ATP.

---

[5] For ease of reference, when citing GX 106, the video of the Defendant's post-arrest interview, the United States will concurrently cite to GSX 1 and the pertinent page on which the statement appears.

[6] Ameen used various screen names, including Shaheen, Journalist M. Fidai, and Striv3r. (*See* GSX 3; GSX 1 at 129-32).

The Defendant knew others in ATP had been arrested, as well. (GSX 1 at 122-25, 150). As he told Special Agent Smith, of the people who helped him start ATP, "a lot of 'em are not around any more." (*Id.* at 26). Despite this, he soldiered on in support of ISIS.

The nature and circumstances of the Defendant's conduct are serious and meaningful; ISIS says as much. There is no conceptual distinction for ISIS between its fighters on the battlefield and its fighters behind a monitor, nor should there be one for the Court. The Defendant falls into the latter category, and he and his organization – the very vehicle by which he committed the charged offense – wage war on behalf of ISIS in a way no less profound than those who hold an assault rifle or strap explosives to their chest. Indeed, it is more meaningful today than ever before, inasmuch as the physical Caliphate has been dismantled but disaffected sympathizers across the world ingest ISIS propaganda and are moved to terrorism and violence under the group's banner.

The Defendant's history and characteristics show an abiding commitment to ISIS and a cavalier, if not approving, attitude toward its barbarity. The Defendant consumed untold pieces of violent jihadist propaganda for years before forming ATP, laughing about and hoping that more innocents would be murdered on camera and that he would get to indulge himself in the lurid spectacle. He then formed ATP, bringing together a group of like-minded individuals, some of whom had a direct connection to ISIS and served as OFAC-designated ISIS leaders in the Middle East and Asia. Through ATP, he was no longer a passive consumer. The Defendant created and amplified a prodigious number of violent extremist products, propagating terrorism across the globe.

The Defendant should be incapacitated to protect the public. His relentless consumption of ISIS's brutal violence in the name of his cause informs the danger he presents to the public.

His efforts to amplify ISIS's recruiting and solicitation endeavors raise the specter of harm in every corner of the world they touch.

The Defendant's affiliation with ATP also shows a marked need for deterrence. Legitimate media companies and governments from across the world tried time and again to deplatform him and shut down the accounts from which he spewed ISIS agitprop. Time and again, he was undeterred, following the *Inside 8* playbook and opening new accounts to continue spreading his terroristic vitriol. Even witnessing his ATP brothers getting arrested failed to slow the Defendant's pace. Seeing his cohort diminish as they were charged with crimes across the world, he did not reflect on the propriety of his actions. On the contrary, he continued his work and even engaged with a man he believed to speak on behalf of ISIS itself.

All considerations attendant to the Defendant's relationship with ATP, the products he generated, and the radical and violent views he holds point squarely to one conclusion. The Defendant should be sentenced to a 240-month term of imprisonment, just as prescribed by the United States Sentencing Guidelines.

II.     *The Offense of Conviction Alone Merits a Guidelines Sentence.*

The Defendant readily undertook a mission on behalf of ISIS; one that was pitched to him as coming directly from ISIS leadership and of exceeding importance. He completed this project, but he was not satisfied merely with the assignment given him. Rather, he offered constructive feedback about ISIS operations and made his own suggestions for how he could best serve ISIS. At his own initiative, he began the process of producing an entirely new media product for the terror group, one that he considered to be even more important than the video it originally requested. The Guidelines properly account for the severity of the instant offense of conviction. Even if the Court were to ignore the seriousness of the Defendant's activities with

ATP prior to his charged conduct – which it ought not do – a 240-month sentence would still be appropriate.

While operating as ATP's leader and administrator of its Telegram forum, the Defendant became acquainted with and invited a notional ISIS operator into his online proto-community, the predecessor to ATP. (Doc. 208 at 189-192). In fact, the operator was an online covert employee ("OCE") for the FBI. (*Id.*). Their relationship flourished, even to the point of the Defendant pointing out military positions to the OCE as "good logistics" for transmission to ISIS forces. (*Id.* at 201-02; GX 17).

In December 2020, the Defendant told the OCE in a secret chat that he was contemplating updating *Clarifying Matters of Methodology*, the ISIS tract that expounds on which populations are fair game for targeting in acts of terror. (GX 12; Doc. 208 at 144, 237; GX 18 at 2). The OCE commented that such work was important to ISIS leadership, and the defendant asked if the OCE – again, ostensibly speaking on ISIS's behalf – could identify any editing that needed done. (GX 18 at 3-8).

As the conversation progressed, the Defendant began to make suggestions to the OCE that he hoped would make their way to the central media *diwan*. For example, the Defendant believed ISIS would be well served by giving better direction to *munasirin* like him concerning what translations would be of most utility. (*Id.* at 14). He suggested certain materials that he thought needed translating, and he even critiqued some of ISIS's more recent media products. (*Id.* at 14-17). When the OCE lamented the lack of fluent English-speakers working on translations, the Defendant remarked that he himself was "in the dragon's lair" and had to "move smart." (*Id.* at 17). Perhaps in view of that metaphor, the Defendant began to delete his

conversations with the OCE, despite his later claim that he believed all of this conduct to be lawful. (*E.g.,* Doc. 209 at 37; GX 18 at 29).

It was at this point that the Defendant and the OCE discussed the ATP translation of *Bleeding Campaigns*.

The OCE told the Defendant that the *diwan* was preparing to embark on a very important project: the revitalization of Al Hayat Media Center, which was ISIS's in-house label for producing the vast majority of its English-language content. (Doc. 209 at 31; GX 18 at 26). That rebirth would start with the translation and distribution of *Bleeding Campaigns*, as it was one of the most recent ISIS productions. (*E.g.,* Doc. 209 at 30-32, 90). Over and again, the OCE reiterated that the project was very important and that it was undertaken on "direct orders" from the *diwan.* (*E.g.*, GX 18 at 30). The OCE even admonished the Defendant not to do it if it put him in danger. (*Id.*).

As the Court saw firsthand at trial, the Defendant completed and provided the translation to the notional ISIS agent. The Defendant requested that a draft transcript be provided to him, shopped it to other members of his group, and ultimately tasked one member with completely redoing the translation. (*E.g.*, GX 18 at 86). When it was finished, he solicited feedback from the *diwan* and was pleased to learn that ISIS thought he had done a great job. (*Id.* at 98-103; Doc. 209 at 119-120). At this point, the Defendant believed himself to be in the employ of ISIS, accomplishing a task at their direction, producing a product that would be adopted in whole and changed only by the inclusion of the terrorist imprimatur: Al Hayat branding, signifying that his work was now an official ISIS media product. (Doc. 209 at 123; GX 18 at 103).

Throughout the translation process for *Bleeding Campaigns*, the Defendant suggested that the "Taliban video" and the "one from Khurasan," i.e., *To be Absolved Before Your Lord*

("*TBABYL*") should be the video for which the *diwan* prioritized translation, since it was – in the considered view of the Defendant – more important to ISIS's mission and explained the deviance of competing terrorist groups. (*E.g.*, GX 18 at 29).

The Defendant got his wish. The OCE transmitted a garbled version of a transcript of *TBABYL*. (GX 18 at 123). The Defendant took the translation and passed it on to an ATP brother, just as he had done with *Bleeding Campaigns*. (*Id.* at 124). Eventually, the Defendant put the OCE (still operating as an ISIS agent) directly in touch with the underling to whom he had assigned the translation. (*Id.* at 138; Doc. 209 at 164). The Defendant was arrested before he could provide the translation of *TBABYL*.

The jury was right to reject the Defendant's implicit claim that, whatever service he provided, it was *de minimis*. The vast majority of media that ISIS creates is in Arabic. (Doc. 208 at 94-95). Through the Defendant's efforts, undertaken at ISIS's public command – and, in relation to the two translations proven at trial, at its notionally direct orders – the terror group managed to translate and propound some of its most strategically important messages and expand its reach throughout the world. (*Id.*). This is a difficult task, requiring specialized language comprehension and knowledge of esoteric jihadist concepts. (*Id.* at 119).

The service the Defendant provided was not merely a fly-by-night helping hand. In addition to his abiding commitment to the ISIS cause, it took a network of skilled operatives to complete the crime set out in the Indictment. As Specialist Karem Kamel testified, translating Arabic to English is, under the best of circumstances, no easy task. (*See, e.g.*, Doc. 210 at 19). ISIS propaganda uses colloquialisms unique unto themselves which can lose meaning if translated carelessly – or even if translated purely literally. (*Id.* at 24-26). Words that mean

something to a typical audience encompass completely different meanings for jihadists in ISIS. (*Id.*).

The translation provided by the Defendant to the OCE took all these things into account. It made wholesale stylistic changes from the original poor-quality transcript provided by the OCE to the Defendant, and it added translations of moment to the message the Defendant believed ISIS wished to propagate. (*Id.* at 32-44; GX 31). The product the Defendant tendered to his purported ISIS contact was not only able to navigate the nuance and contours of conveying a very specific jihadist message to non-native Arabic speakers, it did so with remarkable skill. (Doc. 210 at 44-45). Indeed, for the intended audience of ISIS sympathizers, it was "better than … perfect." (*Id.* at 45).

The Defendant's provision of these services – even were it standing in a vacuum – is a serious crime that calls for serious consequences. As discussed above, the service the Defendant thought he was providing directly to ISIS is, in essence, its lifeblood. Media operations like the ones the Defendant undertook (one of which was of his own devising) are crucial to ISIS and its ability to operate.

The videos the Defendant worked on are themselves noteworthy. *Bleeding Campaigns* was one of the most recent products ISIS had created, showcasing and enlisting support for its war against the Egyptian government. As Dr. Winter explained, the video glamorizes ISIS's war against Egypt and is a "quintessential" example of ISIS war propaganda. (*See* Doc. 131-1). It is a tool designed to project an image of ISIS triumphant and to win the hearts and minds of potential jihadists, deterring potential enemy collaborators by showing the grisly fate that ISIS claims awaits those who would dare oppose the Khilafah. (*Id.*).

And as the Defendant himself aggressively and repeatedly commented, *TBABYL* is so important to ISIS, it should have been the *diwan*'s top priority. *TBABYL* is a set of videos produced by ISIS in Afghanistan, Somalia, and Yemen. (Doc. 208 at 65). The video with which the defendant was concerned is the iteration produced by ISIS in Khurasan (i.e., Afghanistan). (*Id.* at 65-66). The Defendant was not wrong in his assessment. *TBABYL* contains "some of the most important" messages ISIS can spread – it is a recruiting tool that is designed to attract fighters to ISIS and away from competing terror groups like al Qaeda. (*Id.*).

The defendant's crime is no mere academic exercise. ISIS relies on these messages for support and to attract fighters in their perceived "holy war." The consequences of that war are manifest and horrific. For example, ISIS Khurasan ("ISIS-K") – by which the Defendant's ATP brother Mohammed Ameen was employed, and which the Defendant demanded he be allowed to rally with his *TBABYL* translation – is especially brutal and active today. As recently as May 2024, it continues to use videos just like the one the Defendant pressed the OCE to allow him to create in furtherance of its global campaign of terror.

The Defendant and his confraternity of terrorist media *munasirin* ensure that ISIS is not left to grapple with the philosophical adage of whether falling trees make sounds if no one is around to hear. ISIS is unequivocal: its barbaric actions are only as valuable as the volume of the message they send to the world, and thanks to the Defendant and his peers, it knows that millions around the world will bear witness. This no doubt informs ISIS's and the Defendant's loud proclamations that the Defendant's attempted contributions to ISIS (and prior contributions through his work with ATP) are no less valuable than the service provided by the ISIS-K fighters who stormed Moscow's Crocus City concert hall and murdered over 100 people in March 2024. (*See, e.g.*, GX 7 at 202-17; GX 8; GX 48; Doc. 208 at 90-116); *see also, e.g., What is ISIS-K and*

*why Would it Attack a Moscow Concert Hall?*, Mar. 23, 2024,

https://www.reuters.com/world/europe/why-did-isis-k-attack-moscow-theater-2024-03-23/

(discussing ISIS-K and its recent attack on civilians in a crowded theater); *Director Wray's*

*Opening Statement to the House Appropriations Committee*, Apr. 11, 2024,

https://www.fbi.gov/news/speeches/director-wrays-opening-statement-to-the-house-

appropriations-committee-041124 ("[N]ow increasingly concerning is the potential for a

coordinated attack here in the homeland, akin to the ISIS-K attack we saw at the Russia Concert

Hall a couple weeks ago."); *New York officials Ramp up Security After ISIS-K Threat Against*

*Upcoming Men's T20 Cricket World Cup*, May 29, 2024,

https://www.cnn.com/2024/05/29/us/cricket-world-cup-isis-k-threat/index.html (discussing the

security measures required to address a threat to a June 2024 New-York-hosted global sporting

event based on an ISIS-K viral video calling for a "lone wolf" attack at the event).

 The Defendant believed he was employing his cabal of ISIS *munasirin* at the direct

behest of ISIS. He provided a service that ISIS deemed critically important to its success in

inflicting terror on the West. He knew the extraordinary value that ISIS placed on his work, and

how important this crime would be to ISIS if he could complete it. He knew not only through his

consumption of products like *The ISIS Reader's* chapter on ISIS media operations and *Inside 8*.

He knew because the ISIS agent with whom he thought he was corresponding told him –

repeatedly – that the work was important.

 The Defendant's conviction results from his attempt to perform a crucial service for ISIS,

a service it needs for its very survival, as much or more than it needs squads of guerilla fighters.

He provided it without hesitation, and at least in part of his own devising. His crime is uniquely

serious and dangerous, and it is the natural and probable result of his years-long dedication to

serving ISIS and its mission of spreading terror. It also calls for acute intervention. The Guidelines take these important considerations into account, and they prescribe a sentence that is sufficient, but not greater than necessary, to achieve the aims of 18 U.S.C. § 3553(a).

III.     *The Defendant is Remorseless and Obstructive.*

From the time he first latched on to ISIS's ideology, through his founding and operation of ATP, at trial and beyond, the Defendant's conduct demonstrates a fundamental absence of remorse, a commitment to continuing his criminal behavior, a lack of respect for the law, and a profound need for deterrence.

As discussed above, the Defendant was dedicated to ISIS and broadcasting its message of terror despite numerous obstacles – and "off ramps" – before committing the crime for which he is now being sentenced. He was undeterred when platform after platform tried to silence him for violating terms of service. His companions' arrests did not give him pause. He was and remains fully devoted to ISIS and its cause.

The Defendant was open about his support for ISIS. But only to a point. He knew that he was supporting ISIS, and he knew that his conduct was illegal. He conducted his conversations with the OCE – whom he believed to be connected to the ISIS media *diwan* – using Telegram's "secret chat" functions. (*See, e.g.*, Doc. 209 at 21). That alone being insufficient to cover his tracks, when the Defendant believed he was speaking to ISIS about doing its bidding, the Defendant set his messages to automatically delete and, in some instances, manually deleted them himself.   (*See* GX 18 at 29; GX 21; Doc. 209 at 37-39).

Similarly, after he was arrested, the Defendant spoke to law enforcement, but he was not honest. He claimed that, so long as there was "no connection[ or] directive" between his translating and ISIS, he was not materially supporting the group. (*E.g.,* GSX 1 at 99). He did,

however, acknowledge that, if ISIS had told him to publish propaganda, it would constitute "material support." (*Id.* at 60). This likely explains why, when asked about the OCE's persona, he began to dissemble.

The Defendant told Special Agent Smith that the OCE – whom the Defendant at the time believed to be his direct conduit to the ISIS media *diwan* and the source of his assignment from ISIS – was merely "one of those brothers [he didn't] know too much about." (GX 106-m; Doc. 210 at 213-14; GSX 1 at 143-47). When asked about their interaction, the Defendant did not mention the "very important" ISIS translation he had just provided. He did not mention that he believed he was working with the OCE's persona to relaunch Al Hayat. He did not mention the chats with the OCE that took place as recently as two days before his arrest. (Doc. 210 at 213-14). He merely feigned ignorance, claiming that the OCE "doesn't speak too much" but that when he did interact with the OCE, it was just about "general stuff." (GSX 1 at 146).

The Defendant exercised his right to testify at trial. The first words out of his mouth were that he never attempted to provide material support to ISIS. (Doc. 211 at 55). He claimed that he was entrapped and, despite all the evidence to the contrary, he never would have committed this crime but for the Government's illicit conquest of his contrary will. He claimed he was working independently, never under the direction and control of ISIS. To explain the Telegram chats with the OCE, he claimed that he did not think the OCE was a member of ISIS but was instead "embellishing." When asked to explain his prior factual claim in pretrial motion practice that "[i]t's apparent the defendant thought the OCE was working under the direction and control of ISIS – that really can't be disputed," he said he was simply "making a legal argument." (*Id.* at 105, 151; Doc. 70 at 6).

In short, the Defendant offered factual, elemental testimony that ran directly contrary to ample evidence. In reaching its guilty verdict, the jury necessarily and rightly found that testimony to be false.

Separately, the Defendant made other, non-elemental claims that were facially incredible. For example, he claimed not to remember the WhatsApp messages in which he gleefully hoped for more videos of beheadings, though he did apparently remember his motives behind the conversation sufficient to testify that it was "just jokes" and "crude banter." (Doc. 211 at 79, 185). As another example, he took great pains to describe *munasirin* as "sympathizers" rather than "supporters" of ISIS. (*Id.* at 102, 125-26). This despite his own prior statements and ISIS's characterization to the contrary. (*See id.* at 125-27).

The Defendant also claimed that he routinely glorified suicide bombers and celebrated the deaths of American soldiers in *DTR* because it was merely "news," and that the "least important thing of the whole newsletter is the news part." (*E.g.*, *id.* at 193, 206). He was confronted with an example of the "breaking news" he chose to publish in *DTR* that concerned the death of three American "crusaders" and "could not wait until next week to mention":




As we were getting ready to release this week's newsletter, we received notice from the official outlets of the Islamic State of an operation that took place earlier today, which could not wait until next week to mention:

With success from Allah, and following precise monitoring of the Crusaders' activities inside the city of Manbij, our brother Abu 'Abbas ash-Shami (may Allah accept him) set out and detonated his explosive vehicle on a convoy of 4 vehicles transporting American soldiers on the road connecting the cities of Manbij and al-Bab. He succeeded in killing 3 Crusaders and wounding others, and all praise belongs to Allah.

(excerpt from GX 120).

According to the Defendant, the appearance and content of this reporting was not because it was particularly important to him that American soldiers died, but because it occurred on a Friday. (Doc. 211at 211-12).  He first testified that the enormous font and highlighting were because "he didn't have any other way to – really do it" and the highlighting was for color consistency across the page.  (*Id.* at 213).  However, when it was pointed out to him that, in fact, the majority of that *DTR* issue was written in a different font, he admitted "[i]t was a choice I made."

Even while in the custody of the United States, the Defendant manifested his desire to thwart the Government's efforts to combat ISIS.  Writing to one of his ISIS-sympathizing brothers, he gave advice on how not to "move in the open sky prison called America."  Because the brother was "familiar with ATP" more than others, the Defendant was hoping to get him more involved with running the group to continue to do ISIS's media bidding.  (GX 107 at 2, 5). In this succession planning, the Defendant wanted to ensure that the brother who took the baton could "move amongst the Kuffar" and "anger them and make them waste resources" without getting caught:

> You should also know akhi the kuffar do not have access to Telegram. They can't retrieve any chats, alhamdulillah. I simply made the mistake of relaxing my guard. They only have [Telegram] chats from screenshots and pictures from their spy. The kuffar, on the other hand, can retrieve every Facebook, Twitter, Instagram, etc. chats they want. The point is, maintain your guard and keep chats on [Telegram], bithnillah.

(GX 107; Doc. 210 at 222).

Further, the Defendant's conduct shows an acute need for deterrence.  First, for the Defendant himself.  At present, he has shown no willingness to rehabilitate himself or avoid further conduct in support of ISIS.  A Guidelines sentence is necessary in the name of specific deterrence, if nothing else.  Additionally, a Guidelines sentence will serve as a strong general deterrent, clearly conveying to those who would be tempted to follow in the Defendant's

footsteps that there are profound consequences for serving ISIS as a leading light in the ranks of its media *munasirin*.

Remarkably, the Defendant's own words in a letter to his ATP deputy show just how important it is that he receive a Guidelines sentence in the name of deterrence: "You should take it as an absolute fact the FBI knows about you; they get paid to spy and monitor us. *But that shouldn't deter you or any muwahhid*. Give them something to watch akhi, bithnillah." (GX 107 at 3) (emphasis added).

The Defendant has never shown remorse. On the contrary, every step of the way – from his leadership of ATP to the commission of the offense of conviction to his post-arrest interview to his trial testimony to his time in jail – he has demonstrated a foundational lack of respect for the law and a defiant continuing desire to aid ISIS in its war against America. The Court should not reward this behavior by varying from a Guidelines range already reduced by statute.

IV.    *The Court Should Impose a Life Term of Supervised Release With Appropriate Conditions.*

The Court may impose a term of supervised release of any term of years up to life. 18 U.S.C. §3583(j). When imposing a term of supervised release, the Court should consider the factors set forth in Section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). 18 U.S.C. § 3583(c). For the reasons stated above, the United States requests that the court impose a life term of supervised release.

The United States notes the unique nature of this offense and the sophisticated technological means and methods the Defendant employed to commit it. Therefore, in addition to the standard provisions of release imposed by the Court, the United States respectfully requests that the Court's judgment include conditions of release that:

i.     Limit the Defendant's access to computers, including a condition that any and all of the Defendant's electronic devices be outfitted with software sufficient to restrict, record, and monitor all activity on such devices in real time;

ii.    Prohibit or restrict access to social media, including a prohibition on the use of any encrypted messaging platform, including but not limited to, Telegram;

iii.   Prohibit the Defendant's consumption of any and all materials published by or promoting in any way a foreign terrorist organization, including but not limited to, ISIS; and

iv.    Prohibit affiliation of any kind – including all physical or digital affiliation – with groups or individuals who promote any foreign terrorist organization, including all former members of ATP.

Such conditions are related to the relevant statutory factors, will serve to protect the public from the Defendant's future crimes, and involve no greater deprivation of the Defendant's liberty than is reasonably necessary.

## CONCLUSION

The Defendant has been convicted of attempting to provide material support to ISIS. His crime is serious and dangerous. His history and characteristics make him *sui generis*, uniquely poised to provide a foreign terrorist organization a service it fiercely craves. He is remorseless, urging others to pick up and carry the flag taken from him and to never be deterred in their pro-ISIS efforts.

In this case, the Sentencing Guidelines have properly captured the salient statutory factors and the four primary aims of sentencing: retribution, incapacitation, deterrence, and rehabilitation. *E.g.*, *Rita v. United States*, 551 U.S. 338, 347-48 (2007). Accordingly, and for the above-stated reasons, the United States respectfully requests that the Court sentence the Defendant to a 240-month term of imprisonment, to be followed by a life term of supervised release.

Respectfully submitted this 6th day of June, 2024.

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

By:     */s/ Kyle J. Wilson*
        */s/ Casey T. Arrowood*
        Kyle J. Wilson
        Casey T. Arrowood
        Assistant United States Attorneys
        TN BPR No. 031844
        TN BPR No. 038225
        800 Market Street, Suite 211
        Knoxville, TN 37902
        (865) 545-4167
        Kyle.Wilson@usdoj.gov
        Casey.Arrowood2@usdoj.gov

MATTHEW G. OLSEN
ASSISTANT ATTORNEY GENERAL

By:     */s/ Charles J. Kovats, Jr.*
        Charles J. Kovats, Jr
        Trial Attorney
        U.S. Department of Justice
        National Security Division
        950 Pennsylvania Avenue, NW
        Washington, DC 20530
        Tel: 202-616-0736
        Charles.Kovats@usdoj.gov